TRI–STATE OIL TOOL INDUSTRIES, INC., et al., Appellants,

v.

DELTA MARINE DRILLING COMPANY et al., Appellees.

DELTA MARINE DRILLING COMPANY et al., Appellants,

v.

TRI–STATE OIL TOOL INDUSTRIES, INC., et al., Appellees.

No. 25475.

United States Court of Appeals Fifth Circuit.

April 15, 1969.

Rehearing Denied May 19, 1969.

Thomas L. Raggio, Lake Charles, La., for Tri-State Oil Tool Industries, Inc., and Aetna Cas. & Sur. Co., Hall, Raggio, Farrar & Barnett, Lake Charles, La., of counsel.

Fred H. Sievert, Jr., Lake Charles, La., for Delta Marine Drilling Co. and others.

Before GOLDBERG and AINS-WORTH, Circuit Judges, and SPEARS, District Judge.

AINSWORTH, Circuit Judge:

This federal maritime case presents the complex legal question whether indemnity shall be permitted by a tort-feasor, claiming to be only passively or secondarily liable; against a joint tort-feasor guilty of active or affirmative negligence—where no contractual relationship exists between the parties. We hold that the party which is actively negligent should bear the consequences of its wrong and is responsible for the damages incur-

red. Accordingly, it should indemnify the party which is only vicariously or secondarily wrong, for any damages the latter has been compelled to pay.

Thomas D. Fontenot, employed by Delta Marine Drilling Company as a roughneck and member of a drilling crew, was seriously injured aboard Delta Marine's submersible drilling barge when he was struck by a large, heavy piece of wash pipe which had been dropped from an "elevator" belonging to and furnished by Tri-State Oil Industries, Inc. The accident occurred on navigable waters in Louisiana while the barge was submerged for the purpose of drilling for oil. Fontenot filed a complaint under the Jones Act and the general maritime law against Delta Marine and its insurer, Fidelity & Casualty Company of New York, and in maritime tort against Tri-State and its insurer, Aetna Casualty & Surety Company. The case was tried to the District Court without a jury. Judgment was rendered in favor of Fontenot and against defendants Delta Marine and Tri-State jointly and in solido. The District Court dismissed the cross-claims for indemnity filed by Delta Marine and Tri-State against each other, and both appeal that dismissal only. Plaintiff Fontenot was paid his judgment by the parties and has no further interest in the matter.

The issues for decision are stated as follows: (1) Delta Marine, owner of the drilling barge, contends that it is entitled to indemnity from Tri-State, a service contractor, because the contractor negligently furnished defective equipment to the drilling barge which thus rendered the barge unseaworthy causing it to be cast in damages jointly with the contractor; and (2) Tri-State, the service contractor, contends that neither of the cross-claimants, Delta Marine or Tri-State, is entitled to indemnity from the other under existing law, because there was no contractual relationship between them—Tri-State's services and equipment having been procured by the lease owner rather than Delta Marine—but that if there is an extension of the law in this case to permit indemnity, it should be granted to Tri-State because Delta Marine was in charge of the operation and handling of Tri-State's equipment at the time of the accidental injury to Fontenot.

The cross-claims for indemnity grow out of the following circumstances. Ashland Oil and Refining Company, operator of an oil lease, contracted with Delta Marine to drill a well on the lease. During the course of the operations, drill pipe became lodged in the hole. Ashland then contracted with Tri-State to perform what is well known in the industry as a "fishing operation" to dislodge the drilling pipe. Thus Delta Marine and Tri-State contracted independently with Ashland Oil and there was no contract between Delta Marine and Tri-State. Tri-State furnished the necessary equipment, including twenty-four joints of wash pipe, and an "elevator," which were used in the fishing operation. This consisted generally of picking up wash pipe, lowering it into the hole, and then the reverse operation of pulling the wash pipe out of the hole in an effort to catch the drilling pipe. The procedure was described by the District Court in the following language:

"The operation of lifting wash pipe out of the hole is not particularly complicated. The crown of the rig is located some 130 to 136 feet above the drill floor, and from it is suspended the traveling block. Several 'bails' are used to connect the block to the elevator. After one length of pipe has been taken away, the block is lowered over the next section which protrudes slightly above the drill floor. The driller lowers the block so that the elevator stops slightly below the collar of the pipe to be lifted. The backup man pushes the open elevator around the wash pipe below the collar. The lead tong man slams the swinging door shut and the pipe is ready to lift. The driller engages the clutch and the traveling block moves upward, pulling the entire length of pipe up the hole. When a 30-foot joint has cleared the drill floor,

the driller stops while slips and safety clamps are installed so as to avoid dropping the lower part back into the hole. Then the lead tongs are clamped on the top pipe and the backup tongs are put on the bottom pipe. The rotary turns the bottom pipe, and it is thereby unscrewed from the top joint. The roughnecks in the drilling crew grab the suspended end of the wash pipe and walk it toward the 'V' door. The pipe is pushed out of the 'V' door and the driller lowers it down the ramp. There, another crew takes over and the joint is secured in a pipe rack on the barge below."

The operation was performed by Delta Marine under the general supervision of Tri-State but under the immediate control of Delta Marine.[1] On the night of the accident, Fontenot was working as a lead tong man. It was his job to close the elevator doors on the wash pipe. It was Delta's responsibility to ascertain that everything was in order with the wash pipe and elevator before the draw works were raised to pull or pick up the pipe. When the accident occurred approximately twelve joints of pipe remained in the hole. A joint had been unscrewed and had been "walked" toward the "V" door. Richardson, one of the Tri-State men aboard the barge, heard a rattle from above. At about that time the pipe touched the ramp and fell from the elevator, striking Fontenot, whereupon the crew looked up and saw that the elevator door was open.

The District Court concluded that the "elevator was defective and unfit for use"; that the cause of the accident was "the malfunction of Tri-State's defective elevator"; that plaintiff Fontenot was not negligent; that the defective elevator was "a part of the barge's gear, appurtenant appliances and equipment" which "rendered the barge unseaworthy and was a proximate cause of Fontenot's injuries." The Court also found that "Tri-State was negligent in furnishing the defective equipment (elevator) and this negligence was a proximate cause of Fontenot's injuries." On the basis of his findings of negligence of Tri-State and unseaworthiness of Delta Marine's vessel, the District Judge held both defendants liable. In refusing recovery over in the absence of a contractual relationship between the parties, the District Court relied on this Circuit's decision in Halliburton Company v. Norton Drilling Company, 5 Cir., 1962, 302 F.2d 431; rehearing denied, 1963, 313 F.2d 380; cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed. 2d 1032 (1963), and said:

"We recognize that the facts and the rationale in Halliburton are distinguishable, and that the employee of the vessel had not sued the vessel owner but the independent contractor, but as I read that case it governs my decision here. This conclusion has been reached after mature deliberation and some degree of hesitancy."

In *Halliburton*, the facts were as follows: Sims, an employee of Norton Drilling Company, a drilling contractor operating on its own submersible barge in navigable waters, was injured aboard the barge when a chain on a cementing head, furnished by Halliburton, an oil well service concern, broke while Sims and other Norton employees were removing it from the casing. Sims brought his ac-

---

1. The District Judge, in his Findings of Fact, said:
   "The wash pipe and elevator being used in the operation were furnished by Tri-State. However, this part of the operation—that is, putting the wash pipe in the hole and removing it therefrom—was being performed by Delta Marine under the general supervision of Richardson and Jack Jackson, both fish tool operators in the employ of Tri-State."

In the "Memorandum Ruling on Crossclaim" the District Judge further said:
   "Delta Marine had complete control over the operation of the draw works, in laying down the pipe, and in handling Tri-State's equipment with which they were completely familiar. Delta Marine's supervisors accepted the elevator on the job and put it into operation."

tion against Halliburton alleging that his injury was the result of defective equipment which had been supplied by it, and Halliburton filed a third-party complaint for indemnity against Norton alleging negligence and improper handling of the equipment, entitling it to indemnity from Norton by virtue of the implied contractual warranty to remove the cementing head in a careful and workmanlike manner. Halliburton claimed it was entitled to indemnity because Norton was actively or primarily negligent, whereas Halliburton was merely guilty of passive or secondary negligence. There was no contractual relationship between Halliburton and Norton, both of whom were independent contractors of the owner of the well. We held, under the circumstances of that case, that there was no distinction in the kind or degree of negligence asserted against Halliburton and Norton, both being charged with active and affirmative negligence. The Court was satisfied that it appeared beyond doubt, under the pleadings, that Halliburton could prove no set of facts in support of its claim against Norton entitling it to indemnity; that if plaintiff Sims prevailed in his suit against Halliburton, it would be by proof of affirmative negligence of Halliburton—a circumstance which would ipso facto preclude recovery over against Norton. Ibid., 313 F.2d at 381. Finally, we said, " * * * in the absence of a contractual relationship, there is no basis for a claim of contract indemnity." Ibid., 302 F.2d at 435. As the District Judge recognized, and we agree, the facts in the cited case are distinguishable from those in the present case.

Thus we read *Halliburton* narrowly in the circumstances of that case, for it is a generally recognized provision of law in virtually every jurisdiction that the right of indemnity exists between parties, one of whom is guilty of active or affirmative negligence, while the other's fault is only technical or passive. The right is equitable and is dependent upon the legal principle that everyone is responsible for the consequences of his own wrong; that if others are compelled to pay damages that ought to have been paid by the wrongdoer, they may recover from him. This right of indemnity is as well known in the maritime law as any other, as we shall later demonstrate.

In 41 Am.Jur.2d § 20, under the caption "Right to Indemnity of Person Compelled to Pay for Another's Wrong," the following is a general statement of the applicable law:

"Although the proposition that there can be no indemnity between joint tortfeasors is still recognized as a broad general rule, it has been said that the rule which prevents a tortfeasor from recovering from a joint tortfeasor must be viewed in light of the vast growth of negligence law which has markedly changed the characteristics of negligence actions so that legal negligence no longer embodies a concept of misbehavior, and has forced the courts to find a way to do justice within the law so that one guilty of an active or affirmative act of negligence will not escape liability, while another whose fault was only technical or passive assumes complete liability. It has been said that the right of indemnity depends on the principle that everyone is responsible for the consequences of his own wrong, and if others are compelled to pay damages that ought to have been paid by the wrongdoer, they may recover from him. In this connection it has been observed that where one does the act or creates the nuisance, and the other does not join therein, but is thereby exposed to liability and suffers damage, the rule denying contribution or indemnity between joint tortfeasors does not apply, the parties not being in pari delicto as to each other, although either may be held liable as to third persons. A right to implied indemnity among tortfeasors may arise out of a contractual or special relationship between the parties or from equitable considerations. Accordingly, it is generally held that a person who, without fault on his own part, has been compelled to pay dam-

**182**

ages is entitled to recover indemnity where, as between the parties to the indemnity action, the defendant is primarily liable while the plaintiff is only secondarily liable—that is, where the plaintiff is only technically or constructively liable to the injured party, or where his liability was based on a legal or contractual relationship with the defendant. In other words, a joint tortfeasor may recover indemnity where he has only an imputed or vicarious liability for damages caused by the other tortfeasor.

"To the same effect are cases holding that one passively negligent may recover indemnity from one actively negligent, * * *." 2

42 C.J.S. Indemnity § 21, pp. 596, 597, under the caption "Indemnity from Another's Wrong," is to the same effect, as follows:

"One compelled to pay damages on account of the negligent or tortious act of another has a right of action against the latter for indemnity.

"It is a well-recognized rule that an implied contract of indemnity arises in favor of a person who without any fault on his part is exposed to liability and compelled to pay damages on account of the negligence or tortious act of another, the former having a right of action against the latter for indemnity, provided they are not joint tortfeasors in such sense as to prevent recovery, * * *. This right of indemnity is based on the principle that every one is responsible for his own negligence, and if another person has been compelled by the judgment of a court having jurisdiction to pay the damages which ought to have been paid by the wrongdoer they may be recovered from him. It exists independently of statute, and whether or

not contractual relations exist between the parties, and whether or not the negligent person owed the other a special or particular legal duty not to be negligent. * * *"

In Prosser on Torts, § 48 at 279 (3d ed.), it is said:

"The right to indemnity may, * * * arise without agreement, and by operation of law *to prevent a result which is regarded as unjust or unsatisfactory.* Although the ancient specious argument that the courts will not aid one tortfeasor against another because no one should be permitted to found a cause of action on his own wrong, would appear to apply quite as fully to indemnity as to contribution, the courts have been much more disposed to reject it where indemnity is involved.

"Thus it is generally agreed that there may be indemnity in favor of one who is held responsible solely by imputation of law because of his relation to the actual wrongdoer, as where an employer is vicariously liable for the tort of a servant or an independent contractor; or an innocent partner or carrier is held liable for the acts of another, or the owner of an automobile for the conduct of the driver. . . .

"The principle is not, however, limited to those who are personally free from fault. * * * Again, it is quite generally agreed that there may be indemnity in favor of one who was under only a secondary duty where another was primarily responsible, * * *." (Emphasis added.)

The Restatement of Restitution, § 76 at 331 (1937), states:

"A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and

2. Cf. General Electric Co. v. Cuban American Nickel Co., 5 Cir., 1968, 396 F.2d 89, 90, though not a maritime case, in which Judge Wisdom, speaking for this Court, said:

"Indemnity may arise either in contract or in tort: by an express or im-

plied contract to indemnify; or by equitable concepts based on the tort theory of indemnity, for example, when one party has been only 'technically' or constructively at fault and the indemnitee has been actively at fault."

another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct."

Much emphasis is placed by the parties on whether or not the doctrine of Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), should be extended to the facts of this case. But we need not extend *Ryan* in order to afford relief to the parties if the facts justify such action.

Though *Ryan* made it unnecessary for a shipowner to ground its action on tort by the finding, 350 U.S. at 133, 76 S.Ct. at 237, that the obligation of the stevedore "is of the essence of petitioner's stevedoring contract," this holding does not abrogate the right of a party to recover indemnity on a noncontractual basis. In *Ryan*, the question of recovery over on a tort indemnity basis was specifically left open. The Supreme Court held, 350 U.S. at 132, 133, 76 S.Ct. at 237:

> "[T]he shipowner's action for indemnity here is not based merely on the ground that the shipowner and contractor each is responsible in some related degree for the tortious stowage of cargo that caused injury to Palazzolo. Such an action, brought without reliance upon contractual undertakings, would present the bald question whether the stevedoring contractor or the shipowner, because of their respective responsibilities for the unsafe stowage, should bear the ultimate burden of the injured longshoreman's judgment. That question has been widely discussed elsewhere in terms of the relative responsibility of the parties for the tort, and those discussions have dealt with concepts of primary and secondary or active and passive tortious conduct. Because respondent

in the instant case relies entirely upon petitioner's contractual obligation, *we do not meet the question of a noncontractual right of indemnity or of the relation of the Compensation Act to such a right.*" (Emphasis added.)

In the instant case, the parties' arguments and briefs were addressed not only to indemnity based on a contractual theory, but on a tort theory as well.

Prior to the Supreme Court's decision in *Ryan*, tort indemnity was recognized in the federal maritime law where the parties were not in pari delicto.[3] In Jones v. Waterman S. S. Corporation, 3 Cir., 1946, 155 F.2d 992, a seaman brought suit against his employer-shipowner for maintenance, cure and wages. His injury occurred while he was on shore leave as the result of falling into an open ditch alongside a railway siding owned and operated by the Reading Company. The shipowner, Waterman, impleaded the Reading Company, alleging that it was entitled to indemnity. Judgment was entered in favor of Reading against Waterman. On appeal, the Third Circuit (at 996) framed the pertinent issue to be: "May Waterman recover from Reading any sum which it may be required to pay to Jones for maintenance and cure and wages? In other words, if Waterman pays Jones, is Waterman entitled to indemnity from Reading if it be found that Reading negligently caused Jones' injuries?" and held (at 997), "If Waterman will have a claim which it can assert against Reading because compelled to pay Jones money which, absent Reading's negligence in relation to Jones, it would not have to pay, Waterman may assert that claim in the suit at bar by way of its third-party complaint."[4]

In Newport News Shipbuild. & Drydock Co. v. United States, 4 Cir., 1955, 226 F.2d 137, the United States, as owner of a vessel, asserted the right to in-

---

3. See 2 Benedict on Admiralty (6 ed.), § 349, pp. 534, 535, and the various cases footnoted thereto.

4. See the discussion on a shipowner's right to indemnity from a third-party tort-feasor for maintenance, cure and expenses in Gilmore and Black, The Law of Admiralty, § 6–14, pp. 271, 272.

demnity from a shipyard for claims paid to owners of damaged cargo as a result of the alleged negligence of the shipyard in failing to "blank off" a waste line near the water line. Although there was a contract between the parties, the Court held, at 141:

"We think, too, that the trial judge correctly held the damage which resulted from the negligence to be direct and not consequential, *and this whether the claim be regarded in contract or in tort.* * * * Whether denominated 'direct' or 'consequential', we think that [the damages] were clearly recoverable either on the basis of contract *or of tort.*" (Emphasis added.)

In Standard Oil Co. v. Robins Dry Dock & Repair Co., 2 Cir., 1929, 32 F. 2d 182, the Second Circuit affirmed a shipowner's right to recover over for damages paid to a seaman in its employ against a dry dock company. Although there was a contract between the shipowner and the dry dock, indemnity was predicated on tort. The Court said:

"The matter which remained open to litigation in the case at bar was the question whether the defective gangway installed by the dry dock company was the *primary* cause of the injuries to Anstee. The installation of a defective gangway for the use of employees involved active negligence on the part of the dry dock company, whereas the neglect of the Standard Oil Company [shipowner] to inspect the gangway and to warn its employees against danger was a secondary fault of omission. In such circumstances, the plaintiff was entitled to indemnity." Ibid., 32 F.2d at 184.

In another pre-*Ryan* case, Barber S. S. Lines v. Quinn Bros., D.Mass., 1950, 94 F.Supp. 212, a claim for indemnity was made against a stevedoring company, which moved to dismiss the complaint. In denying dismissal, the Court, applying federal maritime law, authorized indemnity not on a contractual basis but on an independent tort theory. The Court said, at 213:

"[L]iability may have been grounded not on any negligence of plaintiff, but on its absolute duty to furnish the stevedore with a seaworthy vessel on which to work. * * * Although indemnity is barred where the parties are joint tort-feasors in *pari delicto,* it may be recovered when the tort-feasor seeking indemnity is not in *pari delicto,* e. g., where its negligence can be considered secondary or merely passive, rather than primary and active. * * * Plaintiff's right to indemnity would thus depend upon whether it was negligent, and if so, upon the nature of its negligence."

We recognize, of course, that the holding in Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), obviates the necessity of a finding of negligence against a stevedore which has breached its warranty of workmanlike service, in order for a shipowner to recover against it. Nevertheless, the *Barber* case demonstrates the general principle of recovery over based on tort.

The decisions subsequent to *Ryan* show that indemnity on a noncontractual basis continues to be recognized in maritime cases.

In Loffland Brothers Company v. Roberts, 5 Cir., 1967, 386 F.2d 540, cert. denied, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968), we impliedly recognized the principle of tort indemnity, although we found that recovery over was not justified by the facts of the case. We held, after noting that recovery could not be predicated on a contract theory of indemnity, "Moreover, we do not believe that [independent contractor] can maintain its action for indemnity against [casing contractor] on a tort theory of indemnity. As indicated earlier, except for the negligence of Roberts, *the record fails to establish any negligence on the part of any other employee* of [the casing contractor]." Ibid., 386 F.2d at 549.

In Lawlor v. Socony-Vacuum Oil Company, 2 Cir., 1960, 275 F.2d 599, 84 A.L. R.2d 613, cert. denied, 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728 (1960), an employee of a shipyard carelessly failed to tie a ladder to a scaffold, causing the ladder to topple and injure another employee of a shipyard. The District Court's ruling, authorizing indemnity to the shipowner by the shipyard, was affirmed by the Second Circuit. Although we may presume there was a contractual relationship between the shipowner and the shipyard, indemnity was obviously allowed on a tort theory. The Court said, 275 F.2d at 601, 602:

"As Bethlehem was in complete charge and control of the scaffolds and ladders,. and one of the Bethlehem men had carelessly failed to affix or tie to the scaffold the ladder which toppled over and caused Lawlor's injuries, we think the negligence count [against the shipowner] of the complaint was properly dismissed. If the recovery against the shipowner for breach of warranty of seaworthiness is sustained Bethlehem is liable on the third party claim over by the shipowner against it."

In the recent case of Simpson Timber Co. v. Parks, 9 Cir., 1968, 390 F.2d 353, the Ninth Circuit had before it an issue which is almost identical to the one with which we are concerned. There, a longshoreman was injured when he stepped through the packaging on a bundle of doors while loading cargo. He brought suit against the shipowner, alleging that the ship was unseaworthy, and against the door manufacturer, alleging negligence in packaging. The shipowner claimed indemnity from the manufacturer. Plaintiff's action was tried to a jury which found the door manufacturer negligent and the ship unseaworthy. The indemnity actions were tried to the Court, which ruled in favor of the shipowner and against the manufacturer, finding that the negligence of the manufacturer consisted in packaging the bundle of doors and in failing to warn of the danger, which negligence was determined to be the sole cause of the injury. The ves-sel was held to be unseaworthy because of the presence of the bundle and for no other reason, the shipowner neither having known nor having been in a position to know of the danger. The Ninth Circuit in affirming said, at 355:

"The shipowner's liability thus rested solely upon the shipowner's breach, without fault, of its nondelegable duty to provide the longshoreman a safe place to work, and the unseaworthy condition was created solely by the manufacturer's wrongdoing. When the shipowner pays the judgment and thus discharges the manufacturer's obligation, the manufacturer cannot equitably be permitted to retain the benefit thus conferred. In these circumstances, settled principles of quasi-contract require the manufacturer to hold the shipowner harmless."

[In a footnote following this language, the Court said:

"In sustaining the district court's judgment granting indemnity against the manufacturer on this ground, we do not mean to suggest that other grounds, not advanced by the shipowner on appeal, would not serve as well. Possible alternative grounds are: (1) that the shipowner was entitled to the benefits of the *express contractual obligation* of the manufacturer to the shipper to package the doors suitably for export, which, if discharged, would have satisfied the shipowner's obligation to provide a safe place to work, and whose breach had the foreseeable consequence of the shipowner's liability to the longshoreman for unseaworthiness * * * (2) that the shipowner was entitled to recover damages, similarly measured, for breach by the manufacturer of implied-in-fact warranty that the packaging was suitable for its foreseeable use as a working floor for the longshoreman * * * or (3) that in negligently packaging the doors the manufacturer violated a *duty owed directly to the shipowner to exercise reasonable care* to avoid the foreseeable harm of the shipowner's liability to the longshoreman. * * * *"

See second paragraph, footnote 4, in pertinent part, at 355, 356.]

The opinion continues:

"Moreover, by imposing ultimate liability upon the negligent manufacturer, the loss is placed upon the actor whose default caused the injury. The one best able to eliminate the risk is given the greatest incentive to do so." Ibid., at 356.

We are in agreement with the principles contained in the *Simpson Timber* case. It would be wrong to assess damages against a non-negligent or passively negligent shipowner for loss or injury suffered solely as the result of active negligence of another party, regardless of the absence of a contractual relationship between the parties.

■■ This accident occurred in navigable waters; therefore, the federal maritime law is the applicable law. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 409, 3 L.Ed.2d 550 (1959). As we have already indicated, maritime law provides for tort indemnity where there is no negligence or only passive negligence attributed to the indemnitee.

Rule 14, Federal Rules of Civil Procedure, pertaining to third party practice, was amended in 1966 by the addition of subdivision (c) (thereby incorporating the features of former Admiralty Rule 56), which subdivision provided for admiralty and maritime claims in third-party practice as follows:

"(c) When a plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h), the defendant or claimant, as a third-party plaintiff, may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. In such a case the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, in which event the third-party defendant shall make his defenses to the claim of the plaintiff as well as to that of the third-party plaintiff in the manner provided in Rule 12 and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff."

■ It is obvious that subdivision (c) embraces the maritime right of recovery by indemnity and that this right is not limited to contractual indemnity.[5]

The District Court predicated its judgment of joint and solidary liability against the two appellants upon its findings of causal negligence of tort-feasor

5. The Notes of Advisory Committee on Rules in regard to the 1966 amendment read in pertinent part as follows:
"Rule 14 was modeled on Admiralty Rule 56. An important feature of Admiralty Rule 56 was that it allowed impleader not only of a person who might be liable to the defendant by way of remedy over, but also of any person who might be liable to the plaintiff. The importance of this provision was that the defendant was entitled to insist that the plaintiff proceed to judgment against the third-party defendant. In certain cases this was a valuable implementation of a substantive right. * * * *"
For an interesting discussion on the adoption of Rule 14 of the Federal Rules of Civil Procedure, see Judge Wisdom's opinion in Falls Industries, Inc. v. Consolidated Chemical Industries, Inc., 5 Cir., 1958, 258 F.2d 277, 283, 284. As a matter of historical background, Rule 14 permitting third-party impleader was patterned on Admiralty Rule 56. Ibid., at 283.
See also Cargill, Inc. v. Compagnie Generale Transatlantique, 5 Cir., 1956, 235 F.2d 240, 242, 243, in which Chief Judge Brown of this Circuit pointed out that Admiralty Rule 56, which permitted third-party impleader under certain circumstances, had its origin in the now-famous decision of Judge Addison Brown in The Hudson, S.D.N.Y., 1883, 15 F. 162.
See also 2 Benedict on Admiralty (6 ed.), § 349, p. 533; § 351, p. 538.

Tri-State and unseaworthiness of Delta Marine's vessel.

■ In regard to Tri-State's claim for indemnity, there can be no recovery over because of the findings of negligence against it by the District Court which we have reviewed and believe to be correct. Certainly they are not clearly erroneous. See Rule 52, Fed.R.Civ.P.

■ As to Delta Marine's claim, however, the District Court did not specifically make a finding as to whether there was active negligence on the part of Delta Marine, being satisfied to rest its decision on the finding of unseaworthiness. The views expressed in this opinion, therefore, require that we remand this case for a determination of whether there was active or primary negligence committed by Delta Marine (as opposed to passive, vicarious, or secondary negligence), and if so, whether such negligence was also, along with the negligence of Tri-State, a proximate cause of the accident.[6] If the District Court should determine from the evidence that it supports a finding of active or primary negligence on the part of Delta Marine, the matter should end there and Delta Marine's claim should be dismissed. On the other hand, should the Court find that Delta Marine was only passively, vicariously, or secondarily at fault, Delta Marine should prevail on its cross-claim.[7]

Reversed and remanded.

6. The District Court, having concluded that breach of the warranty of seaworthiness by Delta Marine coupled with the absence of a contractual relationship between the parties warranted an assessment of damages against Delta, apparently found it unnecessary under the holding of *Halliburton* to determine whether or not Delta Marine was guilty of tort.

7. Under such circumstances, the rule of Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), prohibiting contribution between joint tortfeasors, would be no bar. See Simpson Timber Co. v. Parks, 9 Cir., 1968, 390 F.2d 353, 356; Brown v. American-Hawaiian S.S. Co., 3 Cir., 1954, 211 F.2d 16, 17;

States S.S. Co. v. Rothschild International Stevedoring Co., 9 Cir., 1953, 205 F.2d 253, 255; Crawford v. Pope & Talbot, Inc., 3 Cir., 1953, 206 F.2d 784, 793.

See also Federal Marine Terminals, Inc. v. Burnside Shipping Co., Ltd., 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), where the Supreme Court recently reversed dismissal of a claim of a stevedoring contractor, for indemnity based on tort, against a shipowner for damages to recover longshoremen's and harbor workers' compensation paid for the death of one of the stevedoring contractor's longshoremen, alleged to have occurred because of the shipowner's negligence.