481 F.2d 773
 Lloyd DUGAS, Plaintiff-Appellee,
v.
PELICAN CONSTRUCTION COMPANY, INC., et al., Defendants-Appellees,
Rowan Drilling Company and Union Oil Company of California,
Defendants-Appellants,
Tri-State Insurance Company et al., Third-Party Defendants.
 No. 72-2546.
 United States Court of Appeals,
Fifth Circuit.
 June 11, 1973.
Rehearings Denied July 5, 1973.
 
 W. K. Christovich, New Orleans, La., for Rowan Drilling Co.
 George V. Baus, Harold A. Thomas, New Orleans, La., for Union Oil Co.
 H. Alva Brumfield, III, Baton Rouge, La., for Dugas.
 Nicholls Pugh, Jr., Lafayette, La., for Pelican Constr. Co., Inc., and others.
 Clarence A. Frost, New Orleans, La., for Pelican.
 Donald M. Pierce, New Orleans, La., for Market.
 Before JOHN R. BROWN, Chief Judge, and WISDOM and AINSWORTH, Circuit Judges.
 AINSWORTH, Circuit Judge:
 
 
 1
 Lloyd Dugas, a roustabout employed by Pelican Construction Company, Inc., brought this suit for damages growing out of personal injury sustained aboard a submersible drilling barge, ROWAN NO. 1, owned by Rowan Drilling Company and located on navigable waters at Northeast Patterson Prospect Field, south of Morgan City, St. Martin Parish, Louisiana.
 
 
 2
 Union Oil Company of California had contracted with Rowan for the drilling of an oil and gas well at that location. The contract provided that Rowan furnish a drilling rig and barge and the necessary personnel to operate them. Union was required under the contract to furnish a tugboat and service barge to be used in connection with the operation. Contract depth was specified to be 13,500 feet, for which Rowan was to be paid a fixed rate per linear foot. Rowan was to provide the drilling pipe up to the contract depth. Beyond 13,500 feet the operations were to be conducted on a day-work basis agreement under which Union would furnish the drilling pipe to Rowan.
 
 
 3
 In addition to the contract with Rowan, Union had a service contract with Pelican for the furnishing of labor crews as requested by Union.
 
 
 4
 On September 8, 1964, Rowan was in the process of drilling the well for Union and was operating on day rate, having exceeded the contract depth. Kenneth Ditch, the foreman for Union and its only representative on the drilling barge, called Pelican's office and requested that a crew of roustabouts be sent out to work aboard the drilling barge. Accordingly, a Pelican crew of two pushers, Edward George and Oris Cormier, and four roustabouts, including plaintiff Dugas, left Morgan City, Louisiana, by crewboat and proceeded to the drilling barge, where they arrived at approximately 10 a. m. George was informed by Ditch that the Pelican crew was to unload drilling pipe from a pipe barge onto the drilling barge. The pipe barge, owned by Union and loaded with 4 1/2-inch drill pipe provided by Union, was lying alongside the drilling barge, unmanned. The drilling barge was equipped with a crane and air hoist for use in moving pipe from the pipe barge to the pipe rack aboard the ROWAN NO. 1, and thence to the V-door at the drilling floor when needed by Rowan to run the pipe into the well hole.
 
 
 5
 Upon arrival at the drilling site, the Pelican crew were assigned various jobs preparatory to unloading the pipe. Sometime in the afternoon the unloading operation began, with George, an experienced air hoist operator, operating the hoist and crane. At 7 p. m. Rowan begain putting the pipe into the hole.
 
 
 6
 The accident which precipitated this suit occurred at about 4:30 a. m., the following day. Dugas was then working at the far end of the pipe rack on the drilling barge. He and a Pelican co-worker had just attached a sling to a load of six joints of pipe. George then lifted the pipe but the load instead of moving to the V-door, swung back and hit Dugas, who had turned and was walking in the opposite direction, knocking him to the floor of the rig. When observing Dugas fall, George placed the hoist in neutral, left the controls and ran to a point on the upper deck where he could see Dugas, at which time the air hoist "bled off" allowing the load of pipe to settle on Dugas' legs.
 
 
 7
 Dugas claimed damages from Pelican,[1] his employer, Union and Rowan, asserting liability under the Jones Act, the general maritime law and maritime tort. His theory for Jones Act liability against Union and Rowan was based on the theory that he was the borrowed servant of these defendants.
 
 
 8
 Thereafter a progression of crossclaims between defendants followed, with the parties asserting every known theory of maritime indemnity-tort, contractual (express and implied) and third-party beneficiaries to rights of others under contracts. Virtually everyone claimed over against virtually everyone else.[2] As a result of these numerous claims and long, protracted pretrial procedures, including the taking of depositions, interrogatories and the utilization of other discovery devices, the case did not proceed to trial until almost five years after the initial complaint was filed and approximately six years following the accident, a period much longer than the memory span of most of the testifying witnesses. Consequently, the evidence was in many instances sketchy or conflicting. Nevertheless, the district judge, sitting without a jury found that the sole proximate cause of the injury was the negligence of Union in allowing the Pelican crew to become fatigued and overworked on an undermanned vessel which thus became unseaworthy. In this regard the district judge made the following pertinent findings:
 
 
 9
 "All of the Pelican crew testified that they were very tired. Cormier requested relief at ten o'clock p. m. and again at about two o'clock a. m. Mr. Ditch, the Union superintendent, and the man in charge, had retired for the night. None of the Rowan men had authority to order a relief crew to come out. Mr. Bevills, Rowan's toolpusher, stated that no one requested relief of him that he can remember; but if they had, he would have taken the matter up with Mr. Ditch. Under these circumstances, Union's failure to exercise reasonable care for the safety of the men furnished to it by Pelican was negligence, and its failure to provide a sufficient number of men to do the work that had to be done resulted in an unseaworthy, undermanned ship, which rendered the vessel itself not reasonably fit for her intended use and dangerous to the well being of those aboard her. . . . We find that the inattention of George in allowing the load to swing toward Dugas, as well as the fact that Dugas has turned his back to the load and failed to watch it, as he should have, were the result of their fatigue, a condition that could and should have been foreseen by Union. No effort was made to allow these men to even have a few minutes rest after they began running pipe, or to provide them with food although there was food available. They came aboard, went about their appointed tasks as directed by Mr. Ditch and were thereafter completely neglected. We hold that this failure on the part of Union and the resulting unseaworthiness of the ship was the sole proximate cause of the accident."
 
 
 10
 The district court further found that the dereliction of George and Dugas, if any, was caused by fatigue due to the unrelieved long hours and sustained heavy labor, and did not under the circumstances constitute negligence on their part which was a contributing cause of the accident. The district court concluded that Dugas was a Jones Act seaman of Union under the borrowed servant theory. Damages were assessed in the sum of $45,000 against Union and Rowan as joint tort-feasors-Union, because of its negligence, and Rowan, because of the unseaworthiness of the ROWAN no. 1 caused by Union's negligence. Judgment was also rendered in favor of Union on its cross-claim against Rowan for contribution in the sum of $22,500. Judgment was then rendered in favor of Union on its cross-claim against pelican for one half the amount of the award, under the terms of the contract between the parties, which the district court construed as requiring indemnification for injuries to Pelican's employees regardless of causal negligence by Union. All of the other cross-claims and a counterclaim by Pelican against Market Insurance Company, its public liability insurance carrier, were denied. In short, Rowan and Pelican were each liable for one half the amount of judgment, or $22,500 each, under the district court's decree.
 
 
 11
 Rowan and Union have appealed; Pelican has not appealed inasmuch as it has filed a motion for new trial which inexplicably is still pending in the lower court. Consequently, the issues of contractual indemnity between Union and Pelican and the dismissal of Market Insurance Company are not before us.
 
 ISSUES ON APPEAL COMMON TO ROWAN AND UNION
 
 12
 Both Rowan and Union contend that the district court erred in finding that Dugas was a Jones Act seaman and a borrowed employee of Union; that fatigue contributed to the accident; and in that there was no causal relationship between the accident and the joint and concurrent negligence of plaintiff in turning his back on the pipe, and George in negligently operating the air hoist.
 
 ADDITIONAL ISSUES URGED BY ROWAN
 
 13
 Rowan further contends that the district court erred in basing a finding of unseaworthiness on the undermanning of Pelican's crew, and in failing to award Rowan full indemnity against Pelican because of the latter's alleged breach of the implied warranty of workmanlike service owed to Rowan under the "Ryan"[3] theory of indemnity, as extended by Whisenant v. Brewster-Bartle Offshore Company, 5 Cir., 1971, 446 F. 2d 394.
 
 ADDITIONAL ISSUES URGED BY UNION
 
 14
 Union further contends that the district court erred in failing to grant it full contractual and tort indemnity from both Rowan and Pelican under its contracts with the respective parties and under the active-passive theory of tort indemnity enunciated in Tri-State Oil Tool Indus., Inc. v. Delta Marine Drill Co., 5 Cir., 1969, 410 F.2d 178.[4]
 
 
 15
 The evidence does not support the district court's findings that Dugas was a Jones Act seaman or a borrowed employee of Union. To qualify for Jones Act benefits, an injured worker must be on more or less permanent assignment to a vessel or performing a substantial part of his work aboard a vessel. Offshore Company v. Robison, 5 Cir., 1959, 266 F.2d 769, 799;[5] Thibodeaux v. J. Ray McDermott & Co., 5 Cir., 1960, 276 F.2d 42; Rotolo v. Halliburton Company, 5 Cir., 1963, 317 F.2d 9. Dugas had been employed by Pelican approximately one week prior to his going aboard the ROWAN NO. 1 for the first and only time. Pelican was not the vessel owner and the duties which it assigned to Dugas during that week-cutting grass, repairing a bridge, and land-based office work-were not duties performed aboard a vessel. He and the other Pelican roustabouts were sent out to the ROWAN NO. 1 to do one job-unload a certain number of pipe joints. When the assignment was completed their tour of duty aboard the barge terminated. The job was expected to last, and did last, only a day. Plaintiff's brief tenure aboard the vessel fell far short of establishing seaman status. However, Dugas was entitled, by virtue of the maritime character of the work he performed, to the warranty of a seaworthy vessel. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Rowan and Union concede as much, denying, however, that that warranty was breached.
 
 
 16
 Nor do we think Dugas was a borrowed employee of Union. In Ruiz v. Shell Oil Company, 5 Cir., 1969, 413 F. 2d 310, we listed various factors to be considered in determining whether or not a borrowed employee relationship exists. Id. at 313. Although the trial judge employed the correct legal standards, citing Ruiz as authority for his holding, he erroneously concluded that Dugas was a borrowed employee of Union. In Ruiz we held that the borrowed employee status did not exist because the factor of control, inter alia, had not been relinquished by the general employer nor accepted by the temporary employer. The facts in the present case lead us to the same conclusion. We recognized in Ruiz a distinction between authoritative direction and control over the servant, and mere suggestion as to details or cooperation by the servant with the temporary employer where the work being furnished was part of a larger undertaking.[6] In this case there is not even minimal suggestion, criticism, recommendation or advice in any form by Ditch to Dugas regarding any details of the operation. Dugas had no contact whatsoever with Ditch. He took orders from his pushers only. While numerous factors must be considered to determine whether an individual is a borrowed servant or employee of another, essential to that relationship is some type of agreement, written or verbal, formal or informal, between the general employer and the temporary employer evidencing an intention to create that relationship. There is nothing in the record to indicate that Pelican or Union either intended or desired to establish a borrowed employee relationship between Union and the men Pelican supplied. The written contract itself negates such an intention. The pertinent clause provides that
 
 
 17
 "In the performance of the work herein contemplated, CONTRACTOR [Pelican] is an independent Contractor, with the authority to control and direct the performance of the details of the work, UNION being interested only in the results obtained, but the work contemplated herein shall meet the approval of UNION. CONTRACTOR specifically agrees that all persons employed by CONTRACTOR in performing the work covered by this Contract, or by CONTRACTOR'S sub-contractors, are not the employees of UNION for any purpose whatsoever . . . ." [Emphasis supplied.]
 
 
 18
 Other traditional factors generally indicative of the borrowed employee relationship, and absent here, are "acquiescence by [the employee] that he be employed by [the temporary employer]"; a "temporary termination by the general employer of its relationship with the servant"; "the furnishing by the temporary employer of the necessary instruments and the place for performance of the work in question"; "employment of the servant over a considerable length of time"; and "the customary right to discharge the servant and the obligation for payment of his wages."[7] While no one factor or specific combination of factors is determinative of the borrowed employee relationship, the evidence here preponderates toward the conclusion that such a relationship was not present.
 
 
 19
 The trial judge held-and we agree-that the negligence of Union, with resultant unseaworthiness of the vessel, was the sole proximate cause of the accident. The trial judge found that the Pelican men were fatigued and ascribed this to the failure of Union to provide them with necessary rest periods, thus causing an undermanned and therefore unseaworthy vessel. Both Union and Rowan strongly contest these findings and urge that the negligence of George, in his operation of the crane and air hoist, and the contributory negligence of Dugas, in turning his back to the load of pipe, and not fatigue, were the proximate causes of the accident. Various reasons were advanced in regard to what caused the pipe to fall on Dugas. The testimony of the only two eyewitnesses, George and a Pelican roustabout, Russell Palombo, was not too helpful except to verify the fact of the accident. We are unable to say from the tenuous and conflicting evidence adduced at the trial that the district judge's finding was clearly erroneous in declining to attribute causal negligence to Pelican or to Dugas.
 
 
 20
 The evidence fully supported the finding that the men were fatigued and overworked. The Pelican crew had been working at the drilling site for approximately 18 1/2 hours without relief. By way of contrast, Rowan's men worked 12-hour shifts. Dugas and Palombo, the only other Pelican roustabout to testify, both requested relief. Dugas said that he had worked continuously. He was tired, worn out, could hardly go anymore. Palombo said he was tired as they had worked all day and all night. Cormier said they were operating under fatigue conditions, having worked continuously from the time they arrived at the drilling site at about 10 a. m. until Dugas was hurt at about 4 a. m. the following day.
 
 
 21
 The conflicting evidence in regard to whose orders were being followed in denying relief to the Pelican crew was hardly susceptible of a definite finding, but the trial judge concluded, however, under all the circumstances that Union had the responsibility to take necessary steps to furnish relief. We agree that the evidence compels such a conclusion. Rowan had no such authority. The contract for furnishing the roustabout labor was between Union and Pelican. Rowan had no contract with Pelican. Union's superintendent, Ditch, who was the top authority in this drilling operation, was the only one in a position to relieve the crew. Ditch's testimony corroborated this fact. He said that he was authorized to call for a crew if he needed one. He had hired the Pelican men, but he had not specified the length of time they were to remain on the job. He had authority to stop operations aboard the rig if the occasion arose necessitating it. He would have been in a position to stop unloading if he had seen a situation that he felt was dangerous. The Pelican pusher had reported to him and he put him to work. According to Ditch, ordinarily it would take between 13 to 14 hours to unload the pipe in question, which was in excess of 13,500 feet. Dugas and his co-workers had been working for at least 8 1/2 hours (from 10 or 10:30 a. m. to 7 p. m.) before beginning to unload the pipe. Since Ditch estimated that the unloading would take at least 13 hours, he should have reasonably calculated that the job would not be completed until approximately 8 a. m. the next day, at which time the Pelican men would have worked a total of approximately 22 hours without relief. Ditch's failure to exercise reasonable prudence in making prior arrangements to provide for rest periods or for a substitute crew constituted serious negligence.
 
 
 22
 The concept that seaworthiness contemplates the crew as well as a vessel and its gear has been firmly established in maritime law. In Boudoin v. Lykes Brothers Steamship Co., 348 U.S. 336, 339, 75 S.Ct. 382, 385, 99 S.Ct. 354, the Supreme Court found no reason "to draw a line between the ship and the gear on the one hand and the ship's personnel on the other" in determining whether the warranty of seaworthiness had been breached. In Crumady v. Joachim Hendrik Fisser, 358 U.S. 423, 427, 79 S.Ct. 445, 447, 3 L.Ed.2d 413 (1959), the principle was reiterated that "[u]nseaworthiness extends not only to the vessel but to the crew." Citing Boudoin and Crumady the Supreme Court in Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 727, 728, 87 S.Ct. 1410, 1412, 18 L.Ed.2d 482 (1967), said:
 
 
 23
 "[I]t makes no difference that respondent's vessel was fully manned or that there was a sufficient complement of seamen engaged in the overall docking operation, for there were too few men assigned 'when and where' the job of uncoiling the rope was to be done."[8]
 
 
 24
 Summarizing, we agree with the district court that Union's failure to exercise reasonable care for the safety of the Pelican men was negligence and that Union's failure to provide a sufficient number of men resulted in an unseaworthy, undermanned ship. The district court also correctly cast Rowan in judgment to plaintiff as jointly and solidarily liable with Union on the main demand, in view of the finding of unseaworthiness of Rowan's vessel.
 
 THE CROSS-CLAIMS FOR INDEMNITY
 
 25
 Union v. Rowan. Having found that Union was solely at fault, the district court correctly dismissed the claim of Union seeking indemnity from Rowan under the contract by the terms of which Rowan agreed to indemnify Union except for loss "caused by the sole negligence of Union." Nevertheless, the trial court considered Union's claim broad enough to support a claim for contribution under Horton & Horton, Inc. v. T/S J. E. Dyer, 5 Cir., 1970, 428 F.2d 1131, and rendered judgment in favor of Union and against Rowan for one half of the amount of the award. This was an erroneous conclusion. In Horton we allowed contribution between two joint tort-feasor vessel owners, Horton & Horton, Inc. and Vaughan Marine, Inc., both of which had been found at fault in causing the drowning of a seaman when the barge on which he was working capsized. Horton's fault was based, inter alia, on negligence and breach of the warranty of seaworthiness because of a leaking and otherwise defective hull. Vaughan Marine's fault was based, inter alia, on its negligence in failing to accept the use of pumps. Unlike the present case in which the unseaworthy condition of Rowan's vessel emanated from the negligent act of Union and without which negligence there would have been no unseaworthiness, in Horton each of the tort-feasors was guilty of negligence. The district court, therefore, erred in rendering judgment in favor of Union against Rowan for one half of the award.[9]
 
 
 26
 Union v. Pelican and Tri-State. Union's claim against Pelican under the terms of the service contract between the parties was allowed, based on the trial court's interpretation of the indemnity provision of the contract as imposing the duty upon Pelican to hold Union harmless for injury to its employees even if the injury resulted from Union's negligence. Accordingly, judgment was entered against Pelican in favor of Union for one half of the award. Pelican has not appealed from this ruling, apparently because it is not final, Pelican having filed a motion for a new trial. Union contends, however, that the court erred in failing to allow it full indemnity against Pelican based on an activepassive tort theory of indemnity enunciated in Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Company, 5 Cir., 1969, 410 F.2d 178. Implicit in this contention is that there was active negligence in Pelican through the actions of its employees George and Dugas. Since we find no clear error in the trial court's finding which absolved Pelican of negligence, the legal theory advanced by Union must fall, and indemnity against Pelican denied.
 
 
 27
 Rowan v. Pelican. Having found that Pelican was not at fault, the trial court correctly dismissed Rowan's claim against Pelican based on tort theory of indemnity. It further declined to apply the Ryan[10] doctrine concept of liability to Rowan's claim of a breach of the warranty of workmanlike performance (WWLP). There was no written contract between Rowan and Pelican. Rowan contends it should prevail, however, under the implied warranty doctrine of Ryan, as extended by Whisenant v. Brewster-Bartle Offshore Company, 5 Cir., 1971, 446 F.2d 394, to encompass not only stevedore employers but the specialized independent contractor employer of an injured seaman. Rowan's argument, of course, is predicated on a breach by Pelican of the WWLP. By attributing the accident solely to the negligence of Union, the trial court negated the possibility of any causal breach by Pelican. Even where such a breach occurs, it is immaterial unless it is a proximate cause of the accident or injuries. Garner v. Cities Service Tankers Corporation, 5 Cir., 1972, 456 F.2d 476, 481.
 
 
 28
 Payment to Dugas to compensate him for his injuries is long overdue. Union and Rowan, having been cast as joint tort-feasors on the main demand, must now satisfy their liability. Any further delay, contingent on the ultimate determination of liability as a result of Pelican's pending motion for a new trial on its cross-claim, would be improper.
 
 
 29
 Affirmed in part; reversed in part.
 
 
 
 [1]
 Pelican's insurance carrier, Tri-State Insurance Company, was also named as a defendant
 
 
 [2]
 Rowan filed no cross-claim against Union. We understand from counsel at oral argument, however, that Rowan has instituted separate proceedings against Union seeking indemnity
 
 
 [3]
 Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)
 
 
 [4]
 Union seeks full indemnity against Pelican as a protective measure in the event that Rowan should fail to satisfy Union's judgment for contribution
 
 
 [5]
 According to Robison, there is an evidentiary basis for a Jones Act case "(1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips." 266 F.2d at 779
 
 
 [6]
 See Standard Oil Co. v. Anderson, 212 U.S. 215, 222, 29 S.Ct. 252, 254, 53 L. Ed. 480 (1909); Ruiz v. Shell Oil Company, 5 Cir., 1969, 413 F.2d 310 at 313
 
 
 [7]
 Ruiz v. Shell Oil Company, 5 Cir., 1969, 413 F.2d 310 at 313
 
 
 [8]
 See also Morales v. City of Galveston, Texas, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962); Price v. SS Yaracuy, 5 Cir., 1967, 378 F.2d 156, 160 n. 9
 
 
 [9]
 Union's argument is predicated on our treating as error the finding by the trial court of Union's causal negligence. It alleges active negligence by Rowan in failing to inform Union of the fatigued condition of the Pelican crew, and therefore that it is entitled to recover over from Rowan under an active-passive tort theory. See Tri-State Oil Tool Indus., Inc. v. Delta Marine Drill. Co., 5 Cir. 1969, 410 F.2d 178. Since we are unable to say that the finding of negligence was clearly erroneous, the doctrine of Tri-State inures to the benefit of Rowan, the non-negligent party, and not of Union
 
 
 [10]
 Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)