KRAVITCH, Circuit Judge,
concurring in part and dissenting in part:
The district court, in making its jurisdictional determination, found that the military “did in fact control every aspect of the organization, planning and execution of the convoy in question” including the training of the drivers, the route and speed of the convoy, and that the military even ordered each vehicle in the convoy to follow “a prescribed distance behind and exactly in the tire tracks of the vehicle in front of it.” Based on these factual findings — which I agree are not clearly erroneous — I concur in the majority’s conclusion that a court can not consider the individual negligence of the driver in this case without reexamining sensitive military decisions. Accordingly, I agree that the negligence claims against the driver and the claims against KBR which are dependent upon a finding of driver negligence are barred by the political question doctrine.
I respectfully dissent, however, because in my view Plaintiffs have sufficiently alleged a claim of negligent supervision based on their allegation that KBR breached the requisite duty of care by requiring its driver to work unreasonably long hours, causing driver fatigue, which was a proximate cause of the injury. In its otherwise thorough order, the district court made no factual finding as to whether the military was involved in setting the drivers’ work schedules or was responsible for selecting specific drivers for its missions. The record is therefore insufficient, in my opinion, to determine whether consideration of the negligent supervision claim would require the reexamination of a military decision. For this reason, I would remand the matter to the district court for further factual findings on this jurisdictional question.
As an initial matter, I disagree with the majority’s conclusion that consideration of the negligent supervision claim “would undeniably require Carmichael to show that Irvine’s driving was the sole cause of the accident.” Supra, at Section II.E. It is true that where the sole proximate cause of the alleged injury is the negligence of the employee, to find the employer liable it must first be found that the employee was negligent as charged. Under Georgia law, however, if the negligence of the employer has caused the driver-employee to be fatigued and physically unfit to perform his job, and this fatigue is the proximate cause of the accident, the employer may be found negligent even without a corresponding finding that the driver was negligent. In Reliable Transfer Co. v. Gabriel, 84 Ga. App. 54, 65 S.E.2d 679 (1951), the Georgia Court of Appeals upheld a verdict against
*1297 an employer, who was liable for his negligence in permitting his eo-defendant-driver to operate his truck continuously for longer hours than was permitted by a rule of the Interstate Commerce Commission (“ICC”), despite the fact that the jury found that the driver was not negligent. The court explained that the driver’s actions were caused by his fatigue, which, in turn, was caused by the employer’s negligence in causing and permitting him to work in excess of the time determined by the ICC as likely to cause fatigue. Accordingly, an employer behaves negligently if he requires his driver to work past the point where, due to fatigue, he is physically unable to operate his vehicle with due care and diligence. Then, if the driver’s physical unfitness is found to be the cause of an accident, the employer’s liability for creating this dangerous situation is not dependant upon a finding that the driver himself was negligent. See also Dugas v. Pelican Construction Co., 481 F.2d 773, 776 (5th Cir.1973)[1] (holding that the inattention of the seamen was the result of fatigue, a condition which should have been foreseen by the master, considering the unrelieved long hours and sustained heavy labor; therefore, the master’s negligence was the sole proximate cause of the accident and the seamen’s dereliction, if any, did not constitute negligence on their part). In my view, therefore, the question of KBR’s own liability for negligently allowing Irvine to become physically unfit to operate his vehicle could be submitted to a jury without necessarily implicating Irvine’s conduct or any of the myriad of military decisions which permeated the moment of the accident.
In this case, the undisputed evidence shows that Irvine was on duty in excess of 75 hours in the 6 days preceding the day of the accident.[2] This evidence suggests that driver fatigue caused by over-work[3] may have been a proximate cause of the accident, which supports Plaintiffs’ negligent supervision claim. The majority — reaching an issue that was not addressed by the district court — concluded that Plaintiffs’ reliance on this evidence was “misplaced.” Supra, at Section II.C.3. The majority explained that because Irvine testified that he spent only a portion of the hours indicated on his time cards driving and that most of his time was spent performing other menial tasks, “the figures shown on *1298 Irvine’s time cards do not establish whether Irvine was exhausted at the time of the May 22 convoy, and do not explain what role, if any, that purported exhaustion might have played in the accident.”[4] Id. I do not agree with the majority’s conclusion.
First, I do not believe this court should be considering the merits of Plaintiffs’ claims at this point in the litigation.[5] We are constrained to consider only whether the district court’s findings of jurisdictional facts are clearly erroneous and, based upon those facts, whether the consideration of any of the underlying claims is barred by the political question doctrine. In responding to Defendants’ motion to dismiss, Plaintiffs were required to submit evidence establishing that the resolution of their negligent supervision claim would not require the reexamination of a military decision. They met this burden by submitting the deposition of Robert Stonebraker, a KBR employee and the convoy commander, who testified that although the military determined when and how it needed certain items moved, the KBR foremen were responsible for assigning specific drivers to the convoy. Nothing in the Defendants’ motion to dismiss for lack of subject matter jurisdiction required Plaintiffs to submit evidence establishing causation or otherwise supporting the merits of their claims. Accordingly, the fact that the current record does not definitively show what role driver fatigue played in causing the accident is neither remarkable nor relevant to our jurisdictional inquiry.
(Emphasis added). In this testimony, Irvine admits to being required to work 12-hour days, but explains that time on the time cards which exceeds 12 hours for a day is probably bunker time. Indeed, if taken at face value, the time cards at issue indicate that Irvine worked an average of 19.9 hours a day from May 9th to May 13th. As such, it is reasonable to assume that Irvine meant that the nearly 8 hours a day in excess of his 12 working hours represented paid "bunker” time. Irvine did not claim, as the majority suggests, that his regular 12-hour workday included "a lot of bunker time.”
If, as he claims, Irvine limited himself to working 12 hours a day, he still would have been on-duty at least 72 hours in the six days preceding the day of the accident.
Second, I disagree with the majority’s conclusion that because Irvine was not driving for part of his working hours, the time card evidence is insufficient to sup *1299 port Plaintiffs’ claim that fatigue was a cause of the accident. Under the regulations passed by the Federal Motor Carrier Safety Administration (“FMCSA”) to ensure a safe environment for the commercial drivers and for the driving public — and which KBR allegedly required its drivers to follow — a motor carrier is prohibited from permitting any driver' “to drive a property-carrying commercial motor vehicle ... for any period after ... having been on duty 70 hours in any period of 8 consecutive days.” FMCSR § 395.3(b) (emphasis added). This regulation specifies that, in addition to driving time, “on-duty time” means “all time from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work.” FMCSR § 395.2 (emphasis added). Thus, in requiring Irvine to drive after being on-duty for more than 75 hours in the preceding 6 days, KBR acted in a manner which the FMCSA has proscribed for motor carriers in the United States. Indeed, a commercial driver in the United States would be considered unfit to drive under the FMCSA’s regulations if he had been on-duty in excess of 70 hours in the preceding 8 consecutive days. I believe, therefore, that the evidence raises a genuine issue of material fact as to whether driver fatigue was a contributing cause of this accident. Because deciding this issue would go to the merits of Plaintiffs’ claim, the district court was required “to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiffs case.” Morrison v. Amway Corp., 323 F.3d 920, 925 (11th Cir.2003). Accordingly, I believe Plaintiffs sufficiently alleged and supported a claim of negligent supervision and, if the district court finds that a military decision is not implicated by its consideration, Plaintiffs should be given a proper opportunity to argue the merits of this claim to a factfinder.
Plaintiffs alleged that KBR’s negligence in its supervision of Irvine was a proximate cause of the accident, presented evidence establishing that Irvine worked in excess of 75 hours in the 6 days before the day of the accident, and submitted sworn testimony indicating that KBR was solely responsible for providing the drivers necessary to satisfy the military’s transfer needs and setting the drivers’ work schedules. If KBR — not the military — was responsible for requiring Irvine to work this schedule, a jury could consider whether working such a schedule made Irvine unfit to perform his duties and thereby was a proximate cause of the accident without “reexamining a military judgment.” The district court, however, made no findings of fact regarding the military’s involvement in KBR’s setting of its drivers’ schedules or in KBR’s staffing of the convoys. From the facts currently before us, then, I can not say whether a jury would be required to reexamine a military decision in resolving Plaintiffs’ claim that KBR’s negligence in scheduling Irvine to work 12-hour days was a proximate cause of the accident. See McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1361 n. 30 (11th Cir.2007) (noting that a challenge to the way a contractor provided “ ‘supervision necessary to perform’ the missions [the military] ordered” did not necessarily “require reexamination of any decision made by the U.S. military”). Accordingly, I cannot agree with the majority that, under the facts as found by the district court, Plaintiffs’ negligent supervision claim necessarily is barred by the political question doctrine. For this reason, I would remand this matter to the district court with instructions to make further jurisdictional findings on this issue.
I would also instruct the district court that it should apply the Rule 56 standard of review to the extent it is asked to make factual findings which implicate the merits *1300 of Plaintiffs’ negligence claim. See Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir.1990) (applying the summary judgment standard to determine whether the defendant federal employee was acting within the scope of his employment at time of his alleged negligence, because this inquiry was both a jurisdictional requirement under the Federal Tort Claims Act and an element of the underlying negligence claim). Although a district court usually has substantial authority “to weigh the evidence and satisfy itself as to the existence of its power to hear the case,” Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1261 (11th Cir.1997), it only has this authority “[i]f the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff’s cause of action.” Morrison, 323 F.3d at 925. “If a jurisdictional challenge does implicate the merits of the underlying claim then: [T]he proper course of action for the district court is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiffs case.” Id. (quoting Garcia, 104 F.3d at 1261) (ellipses omitted). With these instructions, I would remand this matter. Accordingly, I respectfully dissent on this narrow ground.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

. The time cards for the week of the accident, which Irvine testified are accurate, establish that Irvine worked 12 hours on May 16th, 14 hours on May 17th, 12.5 hours on May 18th, 12 hours on May 19th, 13.5 hours on May 20th, and 12 hours on the day before the accident, May 21st. As such, Irvine admits to working 76 hours in the six days prior to the accident. On the day of the accident, Irvine also worked a full 12-hour day.

. KBR’s internal investigation determined that the accident was caused by the driver’s traveling at "excessive speed while negotiating a curve [and] not paying attention to surroundings.” There have been numerous studies on the connection between fatigue and a driver's ability to be attentive. See, e.g., David Polin, Cause of Action Against Trucker or Truck Driver for Injuries Caused by Driver Fatigue, 17 Causes of Action 2d 105 (2006) (listing 20 such studies, scientific and otherwise, in the bibliography). The negative effect fatigue has on a driver’s ability to keep a proper lookout is not a newly-discovered phenomenon. Indeed, as early as 1937, the ICC passed regulations limiting a commercial driver’s hours of service to protect the public from the danger posed by fatigued drivers. Ex Parte No. MC-2, In the Matter of Maximum Hours of Service of Motor Carrier Employees, 3 M.CC. 665 (I.C.C. Dec. 29, 1937) (noting that “[a] fatigued driver, whether that fatigue results from excessive hours of work or other causes, may become an inattentive, careless, or otherwise unsafe driver”).

. The majority also states that Irvine "clarified that the time cards reflected twelve hours of pay per day, not twelve hours of work. He explained that the twelve hours included 'probably a lot of bunker time at night.’ ” Supra, at Section II.C.3 (emphasis in original). I disagree with this characterization of Irvine’s testimony.
In its entirety, the section of the deposition relied upon by the majority is as follows:
Q: So from the week of 5/9 to 5/13, you worked a total of 99.5 hours?
A: Well, that’s deceptive when you look at that.
Q: Tell me what you’re talking about.
A: We have 12 hours a day we’re working. That was probably a lot of bunker time at night.
Q: Am I correct that you put in for 99.5 hours of total work that week [of 5/9 to 5/13]?
A: I put in for 99.5 for pay that week.
Q: Okay.
A: These hours over 12 are representing hours in the bunker from mortar attacks and rocket attacks that we were required to go to the bunker. It wasn’t long after that they stopped requiring us to go to the bunker because it was costing too much money, and they just put on your PPE gear and stand by.

. Furthermore, even if the jurisdictional inquiry does require consideration of the merits of the underlying claim, I believe the majority should have applied the "Rule 56 summary judgment standard” in making this inquiry. Lawrence v. Dunbar, 919 F.2d 1525 (11th Cir. 1990) (adopting the summary judgment standard in evaluating Rule 12(b)(1) motions asserting factual challenges to subject matter jurisdiction which also implicate the merits of a claim).