Mrs. Sam **ROTOLO**, Appellant,

v.

The **HALLIBURTON COMPANY**,
Appellee.

No. 20176.

United States Court of Appeals
Fifth Circuit.

May 8, 1963.

Edward C. Alker, New Orleans, La., Milton W. Janssen, Alker & Janssen, New Orleans, La., for plaintiff-appellant.

P. A. Gaudet, New Orleans, La., Deutsch, Kerrigan & Stiles, New Orleans, La., of counsel, for appellee.

Before PHILLIPS,* CAMERON and WISDOM, Circuit Judges.

PHILLIPS, Circuit Judge.

Mrs. Sam Rotolo brought this action against the Halliburton Company to recover damages for the alleged wrongful death of her husband, Sam Rotolo,[1] resulting from injuries sustained by him while in the employ of Halliburton and engaged in the course of his work in welding cracks in the hull of one of its vessels. The action was brought under the Jones Act (46 U.S.C. § 688) and the General Maritime Law and relief was also sought in the alternative under the Louisiana Workmen's Compensation Act.

The case came on for trial before a court and jury. At the close of the plaintiff's evidence in chief, Halliburton moved for a directed verdict on the ground, among others, that there was no evidence that Rotolo, at the time of the accident, was a seaman on any of its vessels. The trial court sustained the motion and di-

---

* Of the Tenth Circuit, sitting by designation.

1. Hereinafter referred to as Rotolo.

rected a verdict in favor of Halliburton, under the Jones Act and General Maritime Law.

Halliburton then moved for summary judgment dismissing the alternative demand under the Louisiana Workmen's Compensation Act, on the ground that the evidence clearly showed that Rotolo's injuries occurred on navigable waters of the United States and therefore the exclusive remedy of Rotolo's beneficiaries is under the Federal Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C.A. § 901 et seq.). The court sustained such motion.

The evidence adduced by the plaintiff below, viewed in the light most favorable to her, showed these facts:

On March 11, 1961, the date when the accident occurred, and for a number of years prior thereto, Halliburton was engaged in the business of servicing oil wells. It had a base at Harvey, Louisiana, where it maintained a district office, repair shops and repairing equipment, and also kept trucks, station wagons, and portable repairing equipment. From such base and over a substantial area, Halliburton rendered its oil well services, both to oil wells on land and oil wells drilled or being drilled in the Gulf of Mexico, known as offshore wells. It employed trucks and other automotive equipment for land transportation and boats for water transportation. It maintained a fleet of 15 vessels and seven barges. Some of its vessels were used to transport material and equipment from the Harvey base to offshore drilling sites for the purpose of rendering oil well servicing. Other of its boats were used to transport its workmen from the shore to such sites and to return them to the shore. Among such boats was Crew Boat No. 503, so called because it was used to transport crews of workmen engaged in rendering such oil well services. Boat No. 503 was a steel boat. It was 38 feet long and its beam was approximately 12 feet. It had no crew quarters, that is, sleeping quarters, and no place where food could be prepared or served. Some canned goods were stored in a locker on the boat.

Halliburton maintained a force of approximately 14 men in its maintenance and repair department at its Harvey base. At least five of such workmen, including Rotolo, who performed substantially the same work, were welders. They did general welding repairs and were known as shop welders. Included in their work was the welding of cracks in steel hulls of Halliburton's boats, welding patches on such hulls, cutting out weakened or damaged areas, and welding, over the holes so made, new metal plates or patches.

When a boat needed repairs and it could be repaired by tying it to a wharf and hoisting that portion of the boat requiring repairs up out of the water, repairs were made at a wharf. When it could not be so repaired, it was moved to the Harvey base for repairs. By far the larger portion of boat repairs was made at the Harvey base. Employees who performed substantially the same services as Rotolo testified that they did from 80 to 90 per cent of their work at the Harvey base and approximately 10 to 20 per cent of their work away from such base. Neither Rotolo nor other repairmen were assigned to a particular boat. On the contrary, when a boat needed repairs the foreman selected a repairman and directed him to make the particular repairs on that boat. In other words, he was assigned and directed to perform a particular job and on its completion to report for assignment to other work, or if done away from the base, to return to the base.

When Rotolo or any other repairman was directed to repair a boat, he decided, after examining the part to be repaired, whether the repairs could be made away from the base, or whether they would have to be made in the repair yard at the base. The captain, or boat operator, had no authority over the repairman. The latter was solely in charge of the repairs.

On the morning of the accident, Boat No. 503 was tied up to Halliburton's Barge 101 at its dock in Leeville, Louisiana. There were two cracks below the water line in the hull of the boat, forward of the beam or center, which caused the boat to leak. Boat No. 503 was in the charge of Weston J. Smith, as the operator thereof. He had been such operator for two and one-half years. Boat No. 503 had only one crew man, the operator. Smith had reported the cracks and requested that the boat be repaired. He had made temporary repairs by cementing the cracks and the boat was not leaking when it was tied up at Leeville, or during the time it was repaired by Rotolo. Smith had also pumped the water out of the hull, so that only about a gallon of water remained therein.

On March 11, 1961, Rotolo, in accordance with directions from his superior, had proceeded to Leeville by truck with a portable electric welding machine, there to repair Boat No. 503, if repairs could be made without bringing it to the Harvey base.

When Rotolo arrived, Smith advised him with respect to the leaks and their location. Rotolo decided the repairs could be made away from the base, but that the bow of the boat would have to be raised out of the water with a winch boom. Such a boom was available at the Gulf Oil Company's nearby wharf. Boat No. 503 was moved from the Halliburton dock to the Gulf Oil Company's wharf and there tied up. Rotolo moved his truck and welding machine from the dock to the wharf and also went to another Halliburton boat, No. 204, for coffee. By means of the winch boom, Rotolo, Smith, and one Guidry raised the boat out of the water, so about three-fifths of the hull was above the water, including the portion where the cracks were located. Smith removed the cement and cleaned the area to be welded. There were no blowers on Boat No. 503 to dry out the hull and there was dampness in the hull. The principal part of the welding machine remained in the truck. The machine was equipped with two cables,

known as whips or leads, of sufficient length to reach from the machine in the truck to the place where the welding was to be done. A holder was attached at the end of the cables and the welding rod was inserted in such holder. The working space was limited and cardboard was laid down for Rotolo to lie on while carrying out the welding operations and Smith held a flashlight to assist Rotolo in seeing, as he carried out the welding. After Rotolo had welded one crack, he proceeded with the welding of the other crack. He had intended to return to the first crack and do additional welding when the first weld had cooled. Smith heard Rotolo moving on the cardboard and asked Rotolo what was the matter and Rotolo did not answer. Smith took the welding rod holder out of Rotolo's hand and received a shock when he did so. Rotolo had suffered serious injuries, which caused his death. Smith stated that he observed that Rotolo's eyes "were popped out of his head." Photographs of Rotolo after his death showed a badly puffed and swollen eyeball and injury to the eyelid. The welding rod, in some unexplained manner, had penetrated through Rotolo's eyeball and into his brain, causing abrasions, bone fractures, and massive hemorrhages.

There was evidence that during the two years preceding the accident repairmen went sent out from the base on several occasions to repair Boat No. 503 and that on each of these occasions the boat was moored to a wharf or dock and was partly raised out of the water and that none of such repairs were made while it was under way. There was no evidence that Boat No. 503 was ever repaired while under way and one witness testified that it would have been impossible so to do. There was no evidence that Rotolo or any other repairman ever assisted Smith or any other Halliburton boat operator in running, moving or navigating Boat No. 503, or any other Halliburton boat. If a boat had to be taken to the Harvey base for repairs, the boat operator, not the repairman, took it to the base. One witness testified that the re-

pairmen, when repairing boats away from the base, did the same work as a worker at a shipyard. Repair jobs on boats done away from the base were of short duration and were usually accomplished in a few hours. One witness characterized such a repair job that took eight hours as a "long job". Had the unfortunate accident not occurred, Rotolo would have finished the repair of Boat No. 503 in about four hours.

Certain of Halliburton's boats were used to transport cement from docks to the drilling barges, to be used in servicing operations. Two witnesses called by the plaintiff below, who performed substantially the same work as Rotolo, testified that they never performed repair services on any boat or barge when it was under way, and that when they performed repairs on a boat or barge it was either tied up at a dock or a wharf or was in the repair yard at the Harvey base. Two of the witnesses called by the plaintiff below testified that there were occasions when such cement boats were under way that they made repairs on the unloading equipment in such boats used to expel the cargo of cement from the cement boat to the drilling barge. However, there was no evidence that Rotolo at any time ever engaged in such repairs on a cement boat while it was under way.

In his brief, counsel for plaintiff below states that plaintiff's position rests entirely upon the contention that "there was a serious question * * * brought out by the testimony, as to whether * * Rotolo, was in fact a seaman" and therefore the trial judge should have allowed the case to go to the jury.

■ While the question whether a person injured in the course of his employment was a seaman within the meaning of that term, as used in the Jones Act, is one of fact, and the trend of the decisions in this and other courts has been to expand the meaning of such

term,[2] it does not follow that in every case involving the question whether the injured person was a seaman, there is an issue of fact which must be submitted to the jury for determination.[3]

In Offshore Company v. Robison, 5 Cir., 266 F.2d 769, 778, 75 A.L.R.2d 1296, this court said:

"* * * the traditional function of court and jury still obtains, in spite of the Gianfala to Grimes—Butler series of cases, and * * * a court, trial or appellate, may in the proper case hold that there is no reasonable evidentiary basis to support a jury finding that an injured person is a seaman and member of a crew of a vessel under the Jones Act. * * *"

In its opinion in the Offshore Company case, at page 779, of 266 F.2d, this court also laid down criteria for determining whether under the evidence there is presented an issue of fact for determination of the jury as to whether the person was a seaman under the Jones Act, as follows:

"* * * there is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips."

In Braniff v. Jackson Ave.-Gretna Ferry, Inc., 5 Cir., 280 F.2d 523, 528, this

2. See review of cases in Offshore Company v. Robison, 5 Cir., 266 F.2d 769.

3. Offshore Company v. Robison, 5 Cir., 266 F.2d 769, 778; Thibodeaux v. J. Ray McDermott & Co., 5 Cir., 276 F.2d 42, 46.

court reiterated the requirement that the injured person be assigned permanently to a particular vessel or several specified vessels, or to perform a substantial part of his work on the particular vessel or several specific vessels. It further held that the relationship between the individual and a particular vessel or several specific vessels must not be spasmodic and must be substantial in point of time and work.

 Here, Rotolo, from time to time, was assigned to do and did a single repair job on a single designated boat. At no given time was he assigned to repair two or more boats. Rather, each of his repair job assignments was always directed to a single repair job on a single boat. While he was assigned to repair different boats, he was not at any time charged with the duty of keeping two or more specified boats in repair. Nor was he ever charged with the duty of keeping a single boat in repair.

Rotolo's connection with a Halliburton boat or boats, by reason of being assigned to do and doing, from time to time, a single repair job on a single designated boat, had no element of permanency. In each instance, his assignment to repair and his repair job on a particular boat was wholly transitory in character. In short, at no time was Rotolo permanently assigned to or connected with a specified boat, or two or more specified boats. And Rotolo did not do a substantial part of his work on a specified boat, or two or more specified boats. And the relation of the repairs which he performed on a boat, if any, to the functioning of the boat, or the accomplishment of its mission, was extremely tenuous. It was substantially different from day-to-day maintenance of a particular boat or boats.

The instant case is clearly distinguishable from a case where the injured person regularly performed a substantial part of his work on every one of several specified vessels, like, for example, a company pilot regularly employed and who customarily and regularly boarded every

one of several vessels to dock and undock it.

It is likewise distinguishable from the Braniff case, supra, where the injured person, a master mechanic, was assigned to keep in repair a specific group of ferries and each morning boarded each of the ferries to ascertain whether any maintenance or repair work needed to be done on it, and then proceeded with his helper and a gang of workmen to do such maintenance or repair work as was needed, either while the ferries were under way or withdrawn from service.

We conclude that there was no reasonable evidentiary basis to support a jury finding that Rotolo, at the time of his injury, was a seaman and member of a crew of a vessel under the Jones Act.

Affirmed.