Jeanette HOLLAND, Administratrix of the Estate of Aaron James Holland, Deceased, Plaintiff-Appellee Cross Appellant,

v.

ALLIED STRUCTURAL STEEL COMPANY, INC., et al., Defendants-Appellants Cross Appellees.

No. 75–1421.

United States Court of Appeals, Fifth Circuit.

Sept. 27, 1976.

Rehearing and Rehearing En Banc Denied Nov. 15, 1976.

Michael S. Allred, Cary E. Bufkin, Jackson, Miss., for appellant.

R. L. Netterville, Natchez, Miss., James W. Nobles, Jr., Jackson, Miss., John G. Roach, Jr., McComb, Miss., for appellees.

Before WISDOM and MORGAN, Circuit Judges, and LYNNE, District Judge.

WISDOM, Circuit Judge.

In *Offshore Company v. Robison*, 5 Cir. 1959, 266 F.2d 769, this Court posed and answered the question: when is a roughneck a seaman? Today, seventeen years later, we face a similar riddle: when is a structural steelworker a seaman? Now, as then, there is no simple formula for determining when an individual's maritime activities or duties in the service of a vessel are sufficient to invoke jurisdiction as a seaman under the Jones Act.[1] Now, as then, our decision must turn on an examination of past cases and the applicability of their rationale to the facts before us. *Offshore v. Robison*, 266 F.2d at 771.

Allied Structural Steel Company [Allied] appeals the judgment entered on a jury verdict of $100,000 in favor of Mrs. Jeanette Holland, widow and administratrix of the estate of James Aaron Holland. James Holland, a structural steel ironworker[2] employed as a steel connector by Allied, fell to his death from a steel stringer being erected as part of the superstructure of the I–20 bridge then under construction over the Mississippi River near Vicksburg. At the time of his death, Holland was engaged in erecting steel over the bank of the River, at the outermost edges of the bridge. He fell approximately 60 feet to his death upon a concrete cofferdam, 250 feet from the water's edge.

Holland had been on the job only six days before his death on February 4, 1971. As part of a "raising gang", Holland worked with five other men in a steel erecting crew headed by Tom Wenzinger. The crew worked in conjunction with one of two Manitowac 4000 cranes utilized to hoist steel beams into place on the superstructure. Holland and the other members of Wenzinger's crew were not assigned to any vessel or vessel-mounted equipment, and they did not sleep or take any meals on any vessel.

Holland's widow, the appellee, sued Allied to recover under the Jones Act and under a claim for breach of warranty of seaworthiness. In an amended complaint, she joined Aetna Casualty and Surety Co. [Aetna] as a party defendant, adding a cause of action for Aetna's breach of an alleged duty to make "safety engineering surveys of the work premises". At the close of the plaintiff-appellee's case, Allied moved for a directed verdict on the first claim, alleging lack of jurisdiction under the Jones Act, and for a directed verdict on the seaworthiness claim. Aetna sought a directed verdict on the single cause of action alleged against it. The district judge granted Aetna's motion and granted Allied's motion as to the seaworthiness claim, leaving only the Jones Act claim against Allied. At the close of

---

1. The Jones Act, 46 U.S.C.A. § 688 (1964), provides:

    Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, . . . . . .

2. The terms steelworker, ironworker, and structural steel ironworker are used interchangeably.

trial Allied again moved unsuccessfully for a directed verdict on the Jones Act claim and the case went to the jury on special interrogatories. The jury found: (1) that Holland was a Jones Act seaman, (2) that Allied was negligent, (3) that Allied's negligence was a proximate cause of Holland's death, and (4) that Holland himself was negligent to the extent of sixty-six and two thirds percent. The jury assessed damages in the amount of $300,000, reduced that amount in proportion to the deceased's negligence, and awarded the plaintiff, Jeanette Holland, a total of $100,000.

The district judge denied Allied's motion for judgment notwithstanding the verdict and Allied brought this appeal. The plaintiff-appellee cross-appealed on the directed verdicts entered in favor of Allied on the seaworthiness claim and in favor of Aetna on the claim for breach of duty to make engineering surveys. We find that only the first of the three appeals merits setting aside the judgment below, and therefore direct this opinion solely to Allied's claim that the evidence at trial was insufficient to support the jury's finding that the deceased was a "seaman" entitled to invoke Jones Act jurisdiction. We agree with Allied's contention that the credible evidence could not have supported the jury's finding and that the district court erred in refusing to grant defendant's motion for judgment n. o. v.

I

INVOKING JONES ACT JURISDICTION

The Jones Act gives a "seaman" (not defined) the right to sue in an action at law for damages arising from the negligence of the owner or personnel of a "vessel" aboard which the seaman was employed. *Offshore Company v. Robison*, 266 F.2d at 771. Half a century ago, the Supreme Court held that the term "seaman" was broad enough to encompass even "stevedores employed in maritime work on navigable water", as their work was "a maritime service formerly rendered by the ship's crew." *International Stevedoring Co. v. Haverty*, 1926, 272 U.S. 50, 52, 47 S.Ct. 19, 71 L.Ed. 157, 159. However, following passage of the Longshoremen's and Harborworkers' Compensation Act, by which Congress extended coverage to all maritime workers except "master[s] or member[s] of a crew of any vessel," the Supreme Court held that the purpose and effect of the enactment was to limit the benefits of the Jones Act to employees who are either masters or members of the crew of a vessel and whose injuries occur during the course of their employment. *Swanson v. Marra Bros., Inc.*, 1946, 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045; *Noble Drilling Corp. v. Smith*, 5 Cir. 1969, 412 F.2d 952, 955. In recent years the traditional notions of both "crew" and "vessel" have been expanded and Jones Act coverage extended to individuals not formally assigned to maritime crews or conventional water-borne vessels. Nonetheless, there remains the jurisdictional requirement that a claimant alleging seaman status under the Jones Act have been connected, in more than a transitory way, with a vessel or vessels, and that his injuries have arisen in the course of his duties in the service of such a vessel or vessels. See, e. g. *Keener v. Transworld Drilling Co.*, 5 Cir. 1972, 468 F.2d 729, 732; *Burns v. Anchor-Wate Co.*, 5 Cir. 1973, 469 F.2d 730, 732; *Owens v. Diamond M. Drilling*, 5 Cir. 1973, 487 F.2d 74, 76.

The determination whether a claimant has proved a sufficient connection with water-borne or vessel-related activities to invoke jurisdiction as a seaman under the Jones Act is a mixed question of law and fact. *Offshore Company v. Robison*, 266 F.2d at 780.[3] Though ordinarily a question to be resolved by the trier of fact, "the

3. As we explained in *Robison*:
Even where the facts are largely undisputed, the question at issue is not solely a question of law when, because of conflicting inferences that may lead to different conclusions among reasonable men, a trial judge cannot state an unvarying rule of law that fits the facts. The Jones Act cases involving coverage are similar in this respect to many negligence and contributory negligence cases. 266 F.2d at 780.

district court may properly refuse to submit [the] issue to the jury where the only rational inference to be drawn from the evidence is that the claimant was not a seaman." *Owens v. Diamond M. Drilling Co.,* 487 F.2d at 76. Moreover, while the jury is charged with resolving the disputed issues of fact on which a claimant's seaman status often depends, evidence manifestly at variance with the physical facts must be disregarded. *Southern Pacific Co. v. Matthews,* 5 Cir. 1964, 335 F.2d 924, 927.

Allied charges that the jury's finding that Holland was a seaman for purposes of the Jones Act must fall on two grounds. First, Allied contends that the testimony of the plaintiff's witnesses was so contradicted by the documentary evidence and by the introduction of prior inconsistent statements that much of the evidence must be held incredible as a matter of law. Second, Allied contends that the remaining credible evidence was insufficient as a matter of law to support a finding of Jones Act status. A careful examination of the record convinces us that both these contentions are well founded, that the jury could not reasonably have believed all of the testimony adduced by the plaintiff's witnesses, and that the remaining credible evidence was insufficient as a matter of law to support a finding that the deceased was a Jones Act seaman.

## II

### UNDISPUTED FACTS

The evidence below established that James Holland went to work for Allied on January 29, 1971 and worked approximately six full days or sixty-two hours before falling to his death the morning of February 4. Through the testimony of witnesses who had worked with the deceased on the bridge project, the plaintiff attempted to establish Holland's seaman status by showing that he had spent a substantial portion of his sixty-two hours engaged in water-borne or vessel-related activities.

In early 1971, the I–20 bridge spanning the Mississippi River near Vicksburg was in the early stages of construction. On the Mississippi side, where the deceased worked, Allied's crews were engaged in erecting a truss span from the first pier, E–3, located on the bank some two hundred and fifty feet from the River, out to falsework or temporary supports closer to the water's edge. As construction progressed, the steel would eventually extend out to pier E–2 in the River, and beyond to the remaining piers.

The steel beams forming the superstructure of the bridge were fabricated in Allied's plants in Hammond, Indiana, or Clinton, Tennessee, and shipped down river on commercial barges to the job site near Vicksburg. The steel on these commercial, or deep draft barges, also referred to as jumbo barges, was then "shaken out" or offloaded to smaller service barges in number sequence appropriate to the sequence of erection. The service barges were then pushed to the side of the River by one of two tugs owned or leased by Allied. When the crews were ready to place the steel on a particular service barge, they brought the barge to the edge of the River in front of the pier and offloaded the steel to the bank with the help of a barge-mounted tower derrick.

On the bank of the River, two Manitowac 4000 crawler cranes, designated C–48 and C–49, were stationed on successive levels of the River bank leading up to pier E–3. The C–49 crane, positioned on the first level up from the River, transferred the steel from the bank to the falsework supports or, if necessary, to the C–48 located on the second level near pier E–3. There James Holland, as head steel connector in Tom Wenzinger's raising gang in charge of the C–48, helped secure the beams in place.

The undisputed testimony at trial revealed that all of the offloading of commercial barges and service barges was performed by ironworkers. Included in their normal duties were the jobs of going out onto the River to unload the commercial barges, shaking out the steel from the commercial barges onto the service barges, flagging the tugs, hooking and unhooking

the lines, operating the spuds or anchors on the commercial barges, bolting steel together on barges, and setting the steel to the bank where it could be erected onto the superstructure. There was also undisputed testimony that some of the ironworkers had, on at least one occasion, gone up river to Allied's Central Industries plant to bring a bargeload of falsework steel down to the job site.

## III

### CREDIBILITY OF THE EVIDENCE PRESENTED BELOW

As its initial challenge to the verdict below, Allied charges that the testimony proffered by the plaintiff's witnesses was so contradicted by the undisputed documentary evidence as to be, in large measure, incredible as a matter of law. To delineate the limits to which the jury was subject in evaluating the credibility of the plaintiff's witnesses, we turn now to consideration of the evidence.

### A.

### PLAINTIFF'S CASE IN CHIEF

In her case in chief, the plaintiff presented the testimony of seven witnesses who had worked at the job site with the deceased. Through widely varying stories, each testified to having seen Holland out on the water at least once, and estimated that he had spent between twenty-five percent and sixty percent of his working time on the River.

One witness estimated that James Holland spent from three and a half to four days on the River, or over half his total time on the job. The witness testified that Holland accompanied him on a barge up river to the Central Industries plant where the crew, with the assistance of the C–49 crawler crane, mounted on the barge, picked up some falsework supports. Another witness, who estimated that Holland spent from twenty-five to thirty hours, or approximately fifty percent of his time, on the River, testified that in addition to help-ing unload steel from the service barges onto the bank, Holland helped offload one of the Manitowac 4000 cranes from a River-based barge and "walk" it up the bank to the higher levels where both cranes were eventually positioned to erect the steel truss span from pier E–3 to E–2. Two other witnesses, each of whom testified that Holland spent approximately fifty percent of his working time out on the water, testified that he took the trip up river to Central Industries and helped offload service barges onto the bank. The remaining two witnesses, one of whom estimated that Holland spent thirty-five percent of his time on the River, testified that he may have helped offload steel from commercial barges in the River and shaken it out onto service barges.

Despite the introduction by defense counsel of prior inconsistent statements by five of the seven witnesses, and the introduction of unchallenged documentary evidence (including photographs) directly contradicting the testimony of the remaining two witnesses, none of the plaintiff's seven witnesses expressly recanted his in-court testimony. Counsel for plaintiff argued that the unrecanted testimony presented by these witnesses proved that the deceased had spent a substantial portion of his time working on the water, and that this time was sufficient to establish his status as a seaman for purposes of invoking jurisdiction under the Jones Act. The district judge, after expressing doubts that the evidence adduced by the plaintiff's witnesses, even if believed, was sufficient to establish seaman's status under the Jones Act, denied defense counsel's motion for a directed verdict and the case proceeded.

### B.

### CROSS–EXAMINATION AND DEFENSE

On cross-examination and later in the presentation of its defense, Allied brought out major discrepancies in the testimony of the plaintiff's witnesses. For example, though three of the witnesses testified that Holland participated in a trip up river to Central Industries, Allied's project diary, prepared during the period of construction,

reflected that the trip to Central Industries took place more than a week before Holland's arrival on the job.[4] The plaintiff's counsel made no serious effort to challenge the accuracy of Allied's records.

Allied's documentary evidence also conclusively rebutted the testimony of those witnesses who swore to having seen Holland assist in walking the C–49 crane up the bank from the River or back down the bank to be mounted on a barge. In addition to Allied's project diary, daily reports prepared by the Mississippi State Highway Department and other daily records prepared by Pavlo Engineering Company revealed that both the C–48 and C–49 cranes arrived on the Mississippi bank before January 29, 1971, Holland's first day on the job.[5] Moreover, dated photographs taken by the Mississippi State Highway Department and stipulated to reflect accurately the scene of the construction site on the days in question, show beyond a doubt that both Manitowac 4000 cranes were positioned on their respective levels of the bank, ready to begin the process of steel erecting as of January 28, the day *before* Holland arrived. The remaining daily project entries of Allied, the Mississippi State Highway Department, and Pavlo Engineering Company for the next seven days are replete with notations indicating that steel erection was underway; nowhere however is there any mention of further movement of the cranes.

Finally, the testimony of the plaintiff's witnesses that Holland went on the River to assist in unloading the commercial barges was both unsupported and contradicted by other evidence in the record. Allied's daily project diary entries record the arrival of only two barges from the beginning of January until Holland's death on February 4, 1971.[6] The first, ATC 409, arrived January 7, carrying the steel for divisions 4, 5, and 6, the divisions needed for the construction on which Holland was working. According to both Allied and Pavlo Engineering Company records, the unloading process for this barge was completed by January 14. The second commercial barge, MV 766, arrived January 18, and Allied records reveal that the crews finished unloading its steel on January 22, a full week before Holland arrived. In the remaining reports by Allied, Pavlo and the Mississippi State Highway Department covering the period up to Holland's death, there is no further mention of the arrival or unloading of any additional commercial barges. The only unloading activities noted are those of unloading steel from service barges moored to the River's edge onto the adjacent bank.

## C.

## STANDARD OF REVIEW AND APPLICATION TO THE EVIDENCE BELOW

This Court is well aware that "it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses", and equally aware that "motions for directed verdicts and judgment n.o.v. should not be

4. Allied's daily project diaries indicate that on January 22, 1971, the crew assigned to the C–49 crawler crane had already made the up river trip to the Central Industries plant. The entry for January 22 states: "C–49 [Manitowac] 4000 crew loading piling and 200 ton tower assemblies at Central Industries yd."

The records of Allied, as well as those of the Mississippi State Highway Department and Pavlo Engineering Company, reflect that the C–49 was back at the job site by January 25, the day it was unloaded from the barge to the Mississippi bank. The photographs taken by the Mississippi State Highway Department and introduced into evidence by Allied show that the 200-ton falsework tower picked up at Cen-

tral Industries was in place at the job site on January 28, one day *before* Holland's arrival.

5. All three records indicate that the C–48 crane arrived on the Mississippi bank January 12, and as of January 20 was still being moved up the bank. The C–49 arrived January 25, and the photographs show it positioned on the first level up from the River's edge on January 28.

6. A third commercial barge, the ATC 304 did arrive January 19, carrying pile cages destined for use on the Louisiana side of the River. There is no evidence however that any of the crews working on the Mississippi side assisted in unloading the ATC 304 during Holland's six days on the job.

decided by which side has the better of the case." *Boeing Co. v. Shipman,* 5 Cir. 1969, 411 F.2d 365, 375. Nonetheless, "the fundamental rule which makes the jury the sole judge of the weight and credibility of testimony is subject to the caveat that testimony concerning a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached, or in no way discredited by cross examination, must be taken as true." *Chicago, R. I. and P. Rwy. Co. v. Howell,* 10 Cir. 1968, 401 F.2d 752, 754.

Here the facts as alleged by Allied were supported by documentary evidence, the accuracy of which was either conceded or left unchallenged by the plaintiff on cross-examination. Moreover, the sequence of events as related by Allied's documents—especially the barge trip to Central Industries, the unloading of the C-49 crane from the barge to the bank, and the shaking out of steel from the commercial barges to the service barges—was wholly inconsistent with the facts as stated by the plaintiff's witnesses. While many of the events related by the plaintiff's witnesses were in fact reflected in the daily records of Allied, Pavlo and the Mississippi State Highway Department, none of them was recorded as having occurred during the period in question.

This unchallenged documentary evidence, further supported by the unimpeached testimony of Allied's own witnesses (including his foreman and several of his co-workers) conclusively refutes the inference that Holland could have participated in all of the River-based or barge-related activities testified to by the plaintiff's witnesses.

#### D.

#### CONCLUSION

A careful examination of both the trial transcript and the documentary evidence introduced by the parties compels the conclusion that a significant portion of the testimony given by the plaintiff's witnesses was incredible as a matter of law. Holland could not have made the trip on a barge up to Central Industries, because that trip was made before he arrived. Nor could he have helped offload the C-49 crane from a barge in the river to the bank, because that work took place January 25, and there is no evidence that the crane was thereafter moved off the bank during the period in question. Finally, the record is simply devoid of any evidence that commercial barges were either arriving or being unloaded during the six days Holland was on the job.

Without attempting to calculate by exactly what proportion the jury should have disregarded as manifestly false the testimony of the plaintiff's witnesses, we hold that reasonable men could not have believed a significant portion of that testimony relevant to the amount of time spent by Holland on the River. At best, the jury could have concluded from the conflicting evidence that Holland spent *some* portion of his sixty-two hours engaged in vessel-related activities, either travelling a short distance up river to bring the service barges to the edge of the bank, or offloading steel from the service barges onto the adjacent bank.

#### IV

#### SUFFICIENCY OF THE CREDIBLE EVIDENCE TO SUPPORT A FINDING OF SEAMAN STATUS

Our holding that a portion of the evidence propounded by the plaintiff's witnesses was conclusively refuted by the unchallenged documentary evidence of the defendant does not end our inquiry. There remains the question whether the remaining credible evidence was sufficient to present a jury question on the issue of the deceased's status as a seaman. We hold that it was not.

#### A.

#### STANDARD OF REVIEW

As noted above, the question whether a claimant has proven facts sufficient to establish his status as a Jones Act seaman is a mixed one of law and fact. In *Robison,* this

Court held that an evidentiary basis for a jury finding of Jones Act jurisdiction exists:

> (1) If there is [sufficient] evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

266 F.2d at 779. See *Dugas v. Pelican Construction Co.,* 5 Cir. 1973, 481 F.2d 773; *Ross v. Mobil Oil Corp.,* 5 Cir. 1973, 474 F.2d 989; *Keener v. Transworld Drilling Co.,* 5 Cir. 1972, 468 F.2d 729; *Labit v. Carey Salt Co.,* 5 Cir. 1970, 421 F.2d 1333; *Thomas v. Peterson Marine Service Inc.,* 5 Cir. 1969, 411 F.2d 592; *Rotolo v. Halliburton Co.,* 5 Cir. 1963, 317 F.2d 9, *cert. denied,* 375 U.S. 852, 84 S.Ct. 111, 11 L.Ed.2d 79; *Braniff v. Jackson Ave.-Gretna Ferry, Inc.,* 5 Cir. 1960, 280 F.2d 523.

■ Recognizing that the test set forth in *Robison* was "an analytical starting point [rather] than a self-executing formula" *Brown v. ITT Rayonier, Inc.,* 5 Cir. 1974, 497 F.2d 234, 236, this Court has continued to elaborate on the evidentiary prerequisites for submitting a Jones Act case to the jury. Evidence of "sporadic contacts for brief periods of time" with water-borne vessels is insufficient to support a jury finding of seaman status. *Labit v. Carey Salt Co.,* 421 F.2d at 1335. Rather, in order to meet *Robison's* requirement that a workman perform a "substantial part" of his work aboard a vessel, "it must be shown that he performed a significant part of his work aboard the ship *with at least some degree of regularity and continuity".* *Kenner v. Transworld Drilling Co.,* 5 Cir. 1972, 468 F.2d 729, 732 (emphasis added); *see*

*Owens v. Diamond M. Drilling Co.,* 487 F.2d at 76.

## B.

## RECENT APPLICATION OF THE *ROBISON* TEST

Despite the narrow scope of review afforded appellate courts in reviewing jury verdicts on the issue of seaman status, *Senko v. La Crosse Dredging Corp.,* 1957, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404, *reh. den.,* 353 U.S. 931, 77 S.Ct. 716, 1 L.Ed.2d 724, this Court has frequently held the issue appropriate for judicial resolution. "While the question whether a person injured in the course of his employment was a seaman within the meaning of that term, as used in the Jones Act, is one of fact, and the trend of the decisions in this and other courts has been to expand the meaning of such term, it does not follow that in every case involving the question whether the injured person was a seaman, there is an issue of fact which must be submitted to the jury for determination". *Rotolo v. Halliburton Co.,* 5 Cir. 1963, 317 F.2d 9, 12; *see Owens v. Diamond M. Drilling Co.,* 5 Cir. 1973, 487 F.2d 74, 76; *Producer's Drilling Co. v. Gray,* 5 Cir. 1966, 361 F.2d 432, 435 and cases cited therein.

Thus, in *Thibodeaux v. J. Ray McDermott & Co.,* 5 Cir. 1960, 276 F.2d 42, we affirmed a district court's directed verdict in favor of the employer denying seaman status as a matter of law to a welder who fell to his death from the deck of an unmanned barge on which he was working. There we stated:

> Here, the decedent fails on many scores. He was a regular shore worker. He lived, ate and slept at home. He was not attached or assigned to any particular vessel either as a member of a crew or otherwise. His customary duties were in welding and cutting on vessels under construction, conversion or outfitting. His relation to the barge . . . was purely transitory—both in point of work to be done and the time of its duration.

Since our decision in *Thibodeaux,* we have continued to analyze the question of seaman status by focusing on an employee's principal duties, the time spent aboard or in the service of a vessel, and the relation of his injury to his vessel-related activities. Thus, in *Brown v. ITT Rayonier,* 5 Cir. 1974, 497 F.2d 234, we overturned a district court's finding that the plaintiff, whose principal duties were on land, but who sustained injuries in the course of a work-related three-hour boat trip, was a seaman under the Jones Act. Notwithstanding the direct relationship between his injury and his vessel-related activity, we found that the trip was "merely incidental to [the employee's] shore-based employment" and thus insufficient to support a finding of seaman status. 497 F.2d at 238.

In *Dugas v. Pelican Construction Co., Inc.,* 5 Cir. 1973, 481 F.2d 773, we again reversed a district court finding of seaman status in favor of a roustabout injured during a one-day stint aboard a submersible barge. There, again notwithstanding the vessel-related nature of the injury, we held that the "plaintiff's brief tenure aboard the vessel fell far short of establishing seaman status." 481 F.2d at 778.

In *Labit v. Carey Salt Co.,* 5 Cir. 1970, 421 F.2d 1333, we affirmed a district court's grant of summary judgment against an employee seeking recovery under the Jones Act for injuries sustained *on shore* when his arm caught in a conveyor belt extending from the land out to a vessel. There we found that the plaintiff's sporadic contacts with vessels being loaded at the conveyor platform "[fell] woefully short of permanent assignment to a vessel or the performance of a substantial part of his work on the vessel." 421 F.2d at 1335.[7]

The case most apposite to the facts before us is *Keener v. Transworld Drilling Co.,* 5 Cir. 1972, 468 F.2d 729. There we dealt with the problem of the "ambiguous-amphibious" worker, whose ordinary duties involved both shore-based and vessel-related work. *Thibodeaux v. J. Ray McDermott & Co.,* 276 F.2d at 44; *Ross v. Mobil Oil Corp.,* 474 F.2d at 991; *Braniff v. Jackson Ave.-Gretna Ferry, Inc.,* 280 F.2d at 525. We emphasized that the mere performance of water-based or vessel-related activities, even if required in the course of the worker's ordinary employment, is not alone sufficient to confer seaman status upon him for every employment-related injury. The *Keener* plaintiff was a roughneck assigned to a fixed drilling platform attached to a tender vessel. He ate, slept, and performed twenty-five percent of his work on the

---

7. This Court and others have repeatedly found seaman status lacking in cases where the plaintiff's contact with a vessel was markedly greater than that shown here. In *Hardaway Contracting Co. v. O'Keeffe,* 5 Cir. 1968, 414 F.2d 657, we affirmed a deputy commissioner's finding that the plaintiff was not a seaman, notwithstanding that at the time of his death the worker was "actually engaged in transferring an oil drum from a small launch to a fixed barge, and that he, on several occasions, had steered the small launch from the shore to the place where it was affixed during the day for the purpose of enabling him and his co-employees to do their work on the bridge." 414 F.2d at 661.

In *Lewis v. Roland E. Trego & Sons,* 4 Cir. 1974, 501 F.2d 372, the Fourth Circuit upheld a dismissal of a Jones Act claim asserted by a maritime construction worker though the worker was injured on a barge in the course of his employment. The court held Jones Act jurisdiction absent as a matter of law, based on findings that the plaintiff performed most of his duties on land, was not assigned to a vessel, slept and took his meals on land, and "went aboard a vessel only when his construction work required him to be on the water." 501 F.2d at 373.

In *Owens v. Diamond M. Drilling Co.,* 5 Cir. 1973, 487 F.2d 74, this Court affirmed a district court's grant of summary judgment against an employee who, as a member of a drilling crew assigned to a rig aboard a stationary drilling platform in the Gulf of Mexico, sustained injuries while working on the platform. Although the plaintiff ate and slept aboard a tender adjacent to the platform and performed miscellaneous duties aboard that vessel, we upheld the district court's finding that his duties performed on the tender, including painting, washing, and cleaning, were too "irregular . . . fortuitous . . . 'minimal in nature [to justify] his contention that he served as a member of the crew of the tender'." The Court's finding that the plaintiff "certainly performed no work aboard the ship with any degree of regularity and continuity" precluded a finding of seaman status. 487 F.2d at 75.

tender, but was injured aboard the platform. There we stated:

> Such incidental and temporary duty aboard the tender does not have the effect contended for by the appellant. . . . While his work [aboard the vessel] may have been sufficient to afford him seaman's status during the period of his occupation with the tasks aboard the tender, such an isolated period of working as a seaman does not enable him to carry that title into perpetuity.

468 F.2d at 731. *See also Desper v. Starved Rock Ferry Co.,* 1952, 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205, *reh. den.,* 342 U.S. 934, 72 S.Ct. 374, 96 L.Ed. 695. Without attempting to define what portion of a worker's duties must be performed aboard a vessel to permit him to claim seaman status, the Court held "that to meet the requirement of *Robison* that the workman 'performed a substantial part of his work on the vessel' it must be shown that he performed a significant part of his work aboard the ship with at least some degree of regularity and continuity. See *Labit v. Carey Salt Co.,* 421 F.2d 1333, 1335, (5th Cir. 1970)."

## C.

### APPLICATION TO THE FACTS BELOW

■ In the instant case, the undisputed evidence showed that James Holland was employed as a steel connector during the time Allied began to erect steel on the Mississippi bank. That he performed the traditional work of a steel connector is verified by photographs showing him "in the air" engaged in steel erecting work on the superstructure of the bridge during the first two days of his employment. It is undisputed that all of Holland's steel erecting work was performed above land.

The credible testimony of the witnesses, taken in the light most favorable to the plaintiff, established at best that James Holland may have spent a portion of his time unloading steel from service barges anchored to the bank of the River and, conceivably, may have assisted in bringing such service barges to the shore from their temporary holding stations a short distance up river. There is no evidence that Holland had more than transitory contact with the water.

Holland was not assigned to any vessel,[8] nor did he eat or take any meals aboard a vessel.[9] As a member of Tom Wenzinger's crew, the only equipment to which he may have been "assigned" was a C–48 crawler crane, which the credible evidence reveals was positioned on the bank of the River for the entire six days of Holland's employment.

Finally, it is undisputed that his fatal fall occurred well away from the water's edge, and that his death was unrelated to any

8. *Compare Senko v. La Crosse Dredging Corp.,* 1957, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404, *reh. den.,* 353 U.S. 931, 77 S.Ct. 716, 1 L.Ed.2d 724; *Gianfala v. Texas Co.,* 1955, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775, *reh. den.,* 350 U.S. 960, 76 S.Ct. 346, 100 L.Ed. 834; *South Chicago Coal and Dry Dock Co. v. Bassett,* 1940, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732; *Kimble v. Noble Drilling Corp.,* 5 Cir. 1969, 416 F.2d 847; *Noble Drilling Corp. v. Smith,* 5 Cir. 1969, 412 F.2d 952; *Bodden v. Coordinated Caribbean Transport, Inc.,* 5 Cir. 1966, 369 F.2d 273; *Offshore Co. v. Robison,* 5 Cir. 1959, 266 F.2d 769; *Wilkes v. Mississippi River Sand and Gravel Co.,* 5 Cir. 1953, 202 F.2d 383, *cert. denied,* 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344, *with Labit v. Carey Salt Co.,* 5 Cir. 1970, 421 F.2d 1333; *Dugas v. Pelican Construction Co.,* 5 Cir. 1973, 481 F.2d 773; *Cox v. Otis Engineering Corp.,* 5 Cir. 1973, 474 F.2d 613; *Burns v. Anchor-Wate Co.,* 5 Cir. 1973, 469 F.2d 730; *Owens v. Diamond Drilling Co.,* 5 Cir. 1973, 487 F.2d 74;

*Hardaway Contracting Co. v. O'Keeffe,* 5 Cir. 1968, 414 F.2d 657; *Rotolo v. Halliburton Co.,* 5 Cir. 1963, 317 F.2d 9, *cert. denied,* 375 U.S. 852, 84 S.Ct. 111, 11 L.Ed.2d 79; *Thibodeaux v. J. Ray McDermott & Co.,* 5 Cir. 1960, 276 F.2d 42; *Lewis v. Roland E. Trego & Sons,* 4 Cir. 1974, 501 F.2d 372.

9. *Compare Grimes v. Raymond Concrete Pile Co.,* 1958, 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737; *Noble Drilling Corp. v. Smith,* 5 Cir. 1969, 412 F.2d 952; *Offshore Co. v. Robison,* 5 Cir. 1958, 266 F.2d 769; *Stanley v. Guy Scroggins Construction Co.,* 5 Cir. 1961, 297 F.2d 374, *with Burns v. Anchor-Wate Co.,* 5 Cir. 1973, 469 F.2d 730; *Hardaway Contracting Co. v. O'Keeffe,* 5 Cir. 1968, 414 F.2d 657; *Rotolo v. Halliburton Co.,* 5 Cir. 1963, 317 F.2d 9; *Thibodeaux v. J. Ray McDermott & Co.,* 5 Cir. 1960, 276 F.2d 42; *Lewis v. Roland E. Trego & Sons,* 4 Cir. 1974, 501 F.2d 372.

vessel or water-based activities.[10]  On the basis of such facts, we find that the evidence failed to establish either that Holland performed a "substantial part" of his work on a vessel or that at the time of his death, he was contributing to the function of any vessel.

### D.
### CONCLUSION

The similarity of the facts in the instant case to those of *Keener* is striking.  Here, as in *Keener,* there was evidence that the employee spent some of his working hours on a vessel.  Here, as there, the employee's principal duties were not performed aboard the vessel.  And here, as in *Keener,* the employee's injuries occurred away from the vessel, and were wholly unrelated to whatever vessel-based duties he may have performed.  A different disposition of the instant case would be irreconcilable with *Keener.*

The plaintiff in the case at bar has cited no decisions, in this circuit or elsewhere, upholding a finding of seaman status for injuries sustained on land by a worker whose principal duties were performed on land and who spent, at most, a fraction of his time engaged in vessel-related activities.[11]  In the absence of such authority, this Court finds no reason to extend Jones Act coverage to persons whose injuries occur on the shore, and whose shore-based work in no way exposes them to the maritime risks against which the Jones Act remedy is designed to protect.  For the foregoing reasons, we hold the credible evidence below insufficient as a matter of law to support the jury's finding that James Holland was, at the time of his death, a seaman entitled to invoke jurisdiction under the Jones Act.  The judgment below in favor of the plaintiff is reversed.  In all other respects the judgment is affirmed.

10.  *Compare Braen v. Pfeifer Oil Transp. Co.,* 1959, 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191; *Grimes v. Raymond Concrete Pile Co.,* 1958, 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737; *Butler v. Whiteman,* 1956, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754; *O'Donnell v. Great Lakes Dredge & Dock Co.,* 1943, 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596; *Barrios v. Louisiana Construction Materials Co.,* 5 Cir. 1972, 465 F.2d 1157; *Noble Drilling Corp. v. Smith,* 5 Cir. 1969, 412 F.2d 952; *Offshore Co. v. Robison,* 5 Cir. 1959, 266 F.2d 769; *Bennett v. Perini Corp.,* 1 Cir. 1975, 510 F.2d 114; *Stafford v. Perini Corp.,* 1 Cir. 1972, 475 F.2d 507; *Slatton v. Martin K. Eby Construction Co.,* 8 Cir. 1974, 506 F.2d 505; *Schantz v. American Dredging Co.,* 3 Cir. 1943, 138 F.2d 534.

11.  Neither *Grimes, Noble, Braniff, Bennett, Stafford, Slatton, Schantz,* or *Senko* stands for the proposition urged by the plaintiff.  The first seven cases involved injuries aboard a vessel or above water in the course of vessel-related work.  *Senko* involved a deckhand permanently assigned to a vessel, who was injured on adjacent land in the course of work performed in the service of the vessel.  All are readily distinguishable from the case at bar.